LAKE SHORE & MICHIGAN SOUTHERN RAILWAY
COMPANY *v.* TEETERS.

[No. 20,695. Filed March 29, 1906.]

1. CARRIERS. — *Passengers.* — *Tort.* — *Contracts.* — *Variance.* — Where a passenger sues in tort for injuries received by reason of the negligence of his carrier, the fact that the evidence discloses the execution of a written contract in relation to such carriage, is not a fatal variance. p. 341.

2. SAME.—*Action.*—*Tort.*—*Contract.*—An action in tort against a common carrier for the neglect of lawfully imposed duties may always be maintained by the passenger injured by reason of such neglect, though such carriage may be founded upon contract. p. 341.

3. SAME.—*Action.*—*Tort.*—*Contracts.*—*Effect.*—In an action in tort by a passenger for the carrier's neglect of lawfully imposed duties, a contract limiting its liability has only the effect of exempting such carrier where such carrier's liability may be provided against by private contract. p. 342.

4. SAME. — *Exemptions.* — *Contracts.* — *Lex Loci Contractus.* — *Effect.*—*Public Policy.*—A contract, made in New York and valid there, exempting the carrier and connecting carriers from liability for injuries received by the person in charge of live stock on a freight-train, does not constitute a defense for a connecting carrier's negligence in Indiana, the public policy of such State forbidding such exemptions. p. 342.

5. SAME.—*Contracts.*—*Exemptions.*—*Public Policy.*—*Action.*—A contract relieving the carrier from plaintiff's right of action on account of such carrier's negligence is against public policy and cannot defeat such action. p. 344.

6. SAME.—*Drovers' Passes.*—*Consideration.*—Regardless of the form of the contract, the consideration for the carriage of a drover lies in the service rendered in caring for the stock or in the price paid for their transportation. p. 344.

7. SAME. — *Drovers.* — *Risks.* — *Negligence.* — While a drover is necessarily subjected to more incidental dangers and risks than the ordinary passenger on a passenger-train, still, if, considering the circumstances, the carrier has been guilty of any negligence causing him injury, such carrier is liable. p. 345.

8. SAME. — *Negligence.*—*Contributory.*—*Drovers.*—Where plaintiff's stock-car was wrecked and plaintiff injured because of negligence of the engineer in charge in the operation of the air-

brakes, plaintiff should recover unless he was guilty of contributory negligence in being in the stock-car where he was injured. p. 345.

9. CARRIERS.—*Contracts.*—*Drovers.*—*Riding in Caboose.*—A railroad company has the right by contract to require drovers in charge of stock to ride in the caboose. p. 346.

10. SAME.—*Drovers.*—*Riding in Stock-Car.*—*Negligence.*—*Contributory.*—In the absence of a contract to the contrary, a drover may ride in his stock-car without being guilty of contributory negligence. p. 346.

11. SAME. — *Contracts.* — *Drovers.* — *Place to Ride.* — Where a drover ships stock under a contract requiring the "man in charge" and "accompanying said stock to take care of the same" to load, unload, feed, water and take care thereof "whilst being transported," and exempting the carrier from liability, except in actual transportation, and exempting it from liability for the escape, crowding, kicking, suffocating or burning of such stock, and making no provision where such drover should ride, he may lawfully ride in such stock-car. p. 348.

12. SAME.—*Contracts.*—*Bills of Lading.*—*Construction.*—A bill of lading issued by a common carrier must be construed most strongly against such carrier. p. 349.

13. SAME. — *Contracts.* — *Connecting Carriers.* — *Assent.* — *Presumptions.*—Where the initial carrier contracts for itself and "on behalf of connecting carriers" to transport a drover together with his stock, the presumption is that the connecting carriers assented to such contract. p. 349.

14. SAME. — *Contracts.* — *Construction by Parties.* — *Drovers.*—*Riding in Stock-Cars.*—*Knowledge.*—Where the carrier knew that a drover was riding in his stock-car in the train and made no objection thereto, the contract of transportation will, in case of doubt, be construed in reference to such interpretation acted upon by the parties interested. p. 350.

15. SAME.—*Drovers.*—*Right to Ride in Stock-Car.*—Where a drover has exempted the carrier from responsibility for the safety of his stock, except for the mere risk of transportation, in the absence of a contract to the contrary he has the right to remain with such stock in the stock-car and take care of the same. p. 350.

16. SAME. — *Drovers.* — *Riding in Stock-Car.* — *Knowledge.* — Knowledge of a drover's riding in his stock-car from day to day by the employes in charge of a freight-train has the implied effect of assigning him there for transportation. p. 350.

17. CARRIERS.—*Drovers.—Riding in Stock-Car.—Whether a Passenger.—Question for Jury.*—Where plaintiff was in charge of stock in the stock-car on a freight-train to the knowledge of the employes and under contract to care for such stock, during transportation, the question whether he was a passenger, where such question depends upon inferences to be drawn from the evidence, was for the jury. p. 351.

18. TRIAL.—*Verdict.—General.—Special.—When Controls.*—Answers to the interrogatories to the jury will control the general verdict only when in irreconcilable conflict therewith under any supposable evidence admissible under the issues. p. 351.

19. EVIDENCE.—*Market Value of Plaintiff's Labor.—Damages.—Carriers.—Railroads.*—Evidence of the market value of plaintiff's labor as a professor and civil engineer is admissible in an action for damages for personal injuries caused by the negligence of a railroad company. p. 353.

20. SAME.—*Exclusion of, Upon Appellant's Objection.—Advantage.*—Where appellant secured a wrong ruling by the trial court on the exclusion of certain competent evidence, it can not take advantage thereof on appeal to urge that there is no evidence to sustain the judgment. p. 354.

21. SAME.—*Future Earnings.*—It is not reversible error to permit plaintiff to testify that he could have earned from $1,200 to $1,500 per year when he had testified that the market value of his services was from $1,200 to $1,800 per year and that prior thereto he had earned $800 per year as salary and from $100 to $400 per year for outside work, and that his present salary was $1,200 per year giving him two or three months for outside work. p. 355.

From Whitley Circuit Court; *Joseph W. Adair,* Judge.

Action by Josiah C. Teeters against the Lake Shore & Michigan Southern Railway Company. From a judgment of the Appellate Court affirming a judgment on a verdict for plaintiff for $10,000, defendant appeals under subd. 3, §1337j Burns 1901, Acts 1901, p. 565, §10. *Affirmed.*

*Olds & Doughman, George C. Greene* and *F. J. Jerome,* for appellant.

*H. W. Mountz* and *Thomas R. Marshall,* for appellee.

GILLETT, C. J.—Appellee brought this action to recover damages sustained by him, through the alleged negligence of appellant, while he was traveling in charge of stock. From a judgment in his favor the company appealed.

The evidence shows that Teeters, who was a professor in the Idaho Industrial·Institute, entered into a contract with the New York Central & Hudson River Railroad Company for the shipment, from Briarcliff Manor, New York, to Chicago, Illinois, of three head of fine cattle, which he had obtained at a stock-farm near Briarcliff Manor for the use of the institution with which he was connected. The stock was shipped in a stock-car of the ordinary type, with slats along the sides. After the loading had been completed, the car was put into a train, and started West. Teeters had climbed into said car, and as it started he and the agent waved adieus to each other. The cattle were tied in one end of the car, and there was straw and feed therein for their use. The car was hauled over the line of the initial carrier to Buffalo, New York, at which point it was delivered to appellant, as a connecting carrier, for transportation to Chicago. As the freight-train containing said car was passing through Burdick, in this State, said car and eight others were wrecked, and Teeters, who had made the journey in said car, was injured. The train was composed of seventy-five cars. The fortieth car from the locomotive was Teeters's. There were air-brakes under forty-nine cars, and it was the last nine of said cars that were wrecked. The accident was caused by a sharp check in the momentum of the air-brake cars, owing to the shutting down of the brakes, thereby causing the cars that were not on the brake line, and which were, of course, strung out to the full extent of the slack under them, to come into collision with the other part of said train. It is not disputed that there was evidence from which the jury was warranted in concluding that the wreck was due to negligence upon the part of the engineer in the operation of the brakes. At the time of the accident Teeters had been nearly five days *en route*. He had taken supper in the caboose on one occasion, and he testified that it was his impression that it was while he was on the Lake

Shore road, although he admitted that he was not certain as to this. His presence upon the train had been known to the brakemen of appellant. He had attended to the feeding and watering of his cattle, from time to time, as occasion demanded, and had furnished milk to the train crew of the train after leaving Buffalo. At Chatham, New York, he spoke to the yardmaster of the New York Central about securing a transfer to another car, as he had been wet by the rain. At Buffalo he asked the yardmaster of said road to have his car transferred so that it might be taken on a Lake Shore freight which was scheduled to depart in a short time. There is no evidence that any of the crew in charge of the train after leaving Elkhart knew that Teeters was on board. When the car was delivered to appellant, it was transferred over a distance of seven or eight miles without a caboose, and at Brewster, New York, while the train was standing in the yards over night, the caboose was taken away, and there was no caboose attached until the next morning. Aside from these instances, there was a caboose attached throughout the trip, a fact that Teeters had knowledge of. He was in the stock-car at the time of the wreck, lying asleep in the hay and straw. He testified that the car was inspected at Buffalo; that he did not notice anything that would indicate that it was unsafe; that it rode very easily, and that he had never had anything to do with the operation or control of a freight-train. He further testified that under the transportation contract it was his understanding that he was entitled to ride or go along as an attendant of the stock.

The contract of shipment was signed by the initial carrier and Teeters. He paid $60 for the shipment. In substance, the contract is as follows: It recites the fact of the delivery of the stock to the carrier, and indicates its destination, and it further recites that the stock has been received by said carrier for itself, and upon behalf of connecting carriers for transportation upon the following

terms and conditions, viz.: that said shipper is at his own sole risk and expense to take care of and to feed and water said stock whilst being transported, and to unload the same, and that neither of said carriers shall be under any liability or duty with reference to such matters, except in the actual transportation of the stock; that said shipper shall see that all doors and openings in said car are at all times so closed and fastened as to prevent escape therefrom of any of said stock, and that neither of said carriers shall be liable on account of the escape of said stock from said car, or for or on account of any injury sustained by said stock occasioned by any of the following causes, to wit: overloading, crowding one upon another, kicking or goring, suffocating, fright, burning of hay or straw used for feeding or bedding, or by fire from any cause whatever, or from causes beyond the control of the carrier; "that whenever the person or persons accompanying said stock under this contract to take care of the same shall leave the caboose and pass over or along the cars or track of said carrier, or of connecting carriers, they shall do so at their own sole risk of personal injury, from whatever cause, and neither said carrier nor its connecting carriers shall be required to stop or start their trains or caboose cars at or from the depots or platforms, or to furnish lights for the accommodation or safety of the persons accompanying said stock to take care of the same under this contract. And it is further agreed by said shipper, that in consideration of the premises and of the carriage of a person or persons in charge of said stock upon a freight-train of said carrier, or its connecting carriers, without charge other than the sum paid or to be paid for the transportation of the live stock in charge of which he is, that said shipper shall and will indemnify and save harmless said carrier, and every connecting carrier, from all claims, liabilities and demands of every kind, nature and description, by reason of personal injuries sustained by said person or persons so in charge of

said stock, whether the same be caused by the negligence of said carrier or any connecting carrier, or any of its or their employes, or otherwise." Attached to said instrument and following the signatures thereto is an instrument entitled, "Release for man or men in charge," which was signed by Teeters, and it purported, "in consideration of the carriage of the undersigned upon a freight-train" without charge other than the sum paid for the carriage of the live stock upon the train, to release and discharge the carrier or carriers from all claims, liabilities and demands for personal injury or damages sustained by such person, whether caused by the negligence of the carrier or carriers or of any of its or their employes.

The complaint does not set up the written contract. The action sounds in tort, and the accepting of the plaintiff as a passenger for hire is alleged, in general terms, as matter of inducement. It is claimed by counsel for appellant that inasmuch as the evidence disclosed the execution of a written contract, there was a fatal variance between the allegation and the proof. This precise question has but recently been determined adversely to the contention of appellant. *Pittsburgh, etc., R. Co.* v. *Higgs* (1906), 165 Ind. 694. The duties which attach to a common carrier in respect to the protection of the lives and limbs of its passengers for hire grow out of the relationship. They may have their foundation in contract, but the responsibility of the carrier in such cases is not measured by its agreement; it is imposed by law. *New York, etc., R. Co.* v. *Lockwood* (1873), 17 Wall. 357, 376, 21 L. Ed. 627; *Ohio, etc., R. Co.* v. *Selby* (1874), 47 Ind. 471, 17 Am. Rep. 719; Goddard's Outlines of Bailments, §323; Pollock, Torts (7th ed.), 521. There can be no doubt as to the right in such a case to sue in tort. As was said by Bayley, J., in *Ansell* v. *Waterhouse* (1817), 2 Chit. 1: "Declarations against carriers in tort, are as old as the law, and continued until *Dale* v.

*Hall* [1750], 1 Wils. 281, when the practice of declaring in assumpsit succeeded; but this practice does not supersede the other. * * * This was only declaring as usual four hundred years before *Dale* v. *Hall, supra."* There is no occasion entirely to wipe out the special contract in order to uphold a recovery under the pleadings; the company has been sued for a violation of its public duty, and the contract has nothing to do with the case except so far as it may bear upon the question as to whether appellee was in a place where he was entitled to the protection of a passenger for hire.

What we have already said concerning the form of the action brings us naturally to the contention of appellant, raised in a variety of ways, that under the decision in *Poucher* v. *New York Cent. R. Co.* (1872), 49 N. Y. 263, 10 Am. Rep. 364, the instrument purporting to be a release of damages was valid and effectual to release both the initial and the connecting carrier, and that therefore the courts of this State should hold that the agreement, being valid where made and where it was partially to be performed, was valid in this State.

While it is the rule that any defense which is based upon the express terms of a contract is governed by the *lex loci contractus,* even though the action be *ex delicto,* yet the fact that the recognition of a provision for an exemption from liability for negligence would contravene the distinctive policy of the state in which the action arose and where the remedy is sought furnishes a sufficient reason for the refusal to recognize such provision. 2 Wharton, Conflict of Laws (3d ed.), §471c. This State is concerned in the protection of the lives and limbs of all persons within its borders, whether interstate passengers or otherwise, and, as respects responsibility for torts committed within the jurisdiction of its laws, its courts will, where necessary, assume to determine the common law for themselves, and will not permit parties to contravene the domestic policy

of the State by invidious contracts for exemptions from liability for negligence.

In a case comparatively recently decided by the Supreme Court of the United States (*The Kensington* [1902], 183 U. S. 263, 268, 22 Sup. Ct. 102, 46 L. Ed. 190), the question was involved as to the validity of a provision in a ticket of transportation from Belgium to the United States which purported to exempt generally the carrier from the consequences of his negligence. The ticket provided that it should be construed according to the laws of Belgium, and there was an offer to prove that the provision was valid where made. In passing on the question as to the validity of the stipulation in this country, the court said: "It is settled in the courts of the United States that exemptions limiting carriers from responsibility for the negligence of themselves or their servants are both unjust and unreasonable, and will be deemed as wanting in the element of voluntary assent; and, besides, that such conditions are in conflict with public policy. * * * The contention amounts to this: Where a contract is made in a foreign country, to be executed at least in part in the United States, the law of the foreign country, either by its own force or in virtue of the agreement of the contracting parties, must be enforced by the courts of the United States, even although to do so requires the violation of the public policy of the United States. To state the proposition is, we think, to answer it. It is true, as a general rule, that the *lex loci* governs, and it is also true that the intention of the parties to a contract will be sought out and enforced. But both these elementary principles are subordinate to and qualified by the doctrine that neither by comity nor by the will of contracting parties can the public policy of a country be set at naught." A well-known writer uses this language: "Public policy is less flexible and yielding, where it comes to fixing the terms of human conveyance, than it appeared where only senseless goods and chattels

were concerned; nor can it be affirmed, as a general proposition, that the carrier of passengers may, by the most implicit understanding between the public transporter and his customer, be brought down even so slightly as to leave the former analogous, in legal responsibility, to an ordinary bailee for hire."] Schouler, Bailments, Including Carriers, §564.

The law recognizes the fact that there is ordinarily little freedom of contract upon the part of the shipper in respect to a bill of lading, and it certainly will not support

5. his agreement to waive his rights at law where the agreement is contrary to public policy. *New York, etc., R. Co.* v. *Lockwood, supra; Baltimore, etc., R. Co.* v. *Voigt* (1900), 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560; *Lake Erie, etc., R. Co.* v. *Holland* (1904), 162 Ind. 406, 63, L. R. A. 948. Cast into what form the agreement may be, the law assumes that the consideration for

6. the carriage of a drover in charge of cattle lies in the service he renders in taking care of the animals or in the charge made against him or his employer for their transportation. *New York, etc., R. Co.* v. *Blumenthal* (1896), 160 Ill. 40, 43 N. E. 809, and cases cited. As was said in *Baltimore, etc., R. Co.* v. *Voigt, supra,* a drover traveling on a pass, for the purpose of taking care of his stock on a train, is a passenger for hire, and it is not lawful for a common carrier of such passengers to stipulate for exemption from responsibility for the negligence of itself or its servants. The case of *New York, etc., R. Co.* v. *Lockwood, supra,* has been frequently followed, and it may be regarded as establishing a settled rule of policy.

Many years ago this court held, in *Ohio, etc., R. Co.* v. *Selby, supra,* following the forceful decision of *New York, etc., R. Co.* v. *Lockwood, supra,* that a drover in charge of cattle which were being shipped under contract was a passenger for hire, and that it was not competent for the

carrier by contract to exempt itself from the consequences of its negligence in the transportation of such a passenger. These holdings have come to express rules of law in this State which are thoroughly established. *Ohio, etc., R. Co.* v. *Nickless* (1880), 71 Ind. 271; *Louisville, etc., R. Co.* v. *Taylor* (1890), 126 Ind. 126. Assuming that appellee had so conducted himself as to be entitled to the protection of a passenger for hire, it must be said that in an action for a tort committed against him by the carrier in this State the courts will not hear the latter to assert that it had by contract abdicated the responsibilities which attached to it by virtue of its calling. *Louisville, etc., R. Co.* v. *Taylor, supra.*

There are some perils which are necessarily incident to traveling as a drover in a stock-car, such as dangers in getting on and off the car, and from such sudden jars as necessarily attend the operation of freight-trains. These belong to the assumed risks of such travel. But it is to be remembered that neither gross nor ordinary negligence is known to the law pertaining to carriers of passengers for hire, and that any failure to bestow the care which the situation demands, resulting in the injury of such a passenger, whether he be a drover or no, is negligence. *New York, etc., R. Co.* v. *Lockwood, supra; Ohio, etc., R. Co.* v. *Selby, supra.* As was said by Osborn, C. J., in *Indianapolis, etc., R. Co.* v. *Beaver* (1873), 41 Ind. 493, 498: "But whether a railroad company undertakes to convey its passengers on a freight or passenger-train, in a caboose or well-cushioned car, its duty is so to run and manage the train that passengers shall not by its own carelessness be killed or injured."

It is clear, in view of the fact that the accident arose from the negligence of the engineer, as shown by appellee's evidence, and found by the general verdict and answers to interrogatories, that there is no question of contributory negligence in the case if, at the time

appellee was in a place where, as a passenger, he had a right to be. While the traveler assumes the discomforts and dangers which are inseparably incident to travel in a stock-car, yet as against a negligent act in the management of the train, such as a wrecking of a portion of it through the negligent operation of the brakes, it cannot be said that the act of the traveler is in anywise contributory thereto. 4 Elliott, Railroads, §1632. "A railroad may lawfully stipulate to carry a passenger in a baggage-car, in an express-car, in a stock-car, or on a freight-train generally." *Chicago, etc., R. Co.* v. *Lee* (1899), 92 Fed. 318, 34 C. C. A. 365.

In view of the rigorous obligations of a common carrier of passengers, the law accords to it the right to require stockmen to ride in the caboose while the train is in motion. The right to enforce such a regulation finds a sufficient reason in the fact that it enables the carrier to concentrate its diligence in the protection of the caboose. The cases indicate the existence of such a requirement on some of the railroads, but appellant does not appear to have exercised this privilege.

Appellant's counsel cite many cases in which it has been held that passengers who voluntarily occupy places of increased hazard outside of those portions of the train intended for their carriage, and are injured as a result, cannot recover, and it is also contended that the very fact that a caboose is attached to a freight-train is notice that the passenger is expected to travel in the car. If a passenger has no business upon other portions of the train, the rules of law suggested might be applied, but in view of the nature of a stockman's duties and responsibilities we doubt the application of such rules as to him. In the first place, the fact is to be borne in mind that the caboose has its own peculiar hazards. We find one case in which the railroad company had required the shipper to sign a bill of lading wherein he agreed to travel on the car

containing the stock, and the company asserted as a defense to an action for his death that he was traveling in an emigrant car attached to the train. *Pennsylvania R. Co.* v. *McCloskey* (1854), 23 Pa. St. 526. Looking at the matter from the viewpoint of a man whose only relation with the railroad consists of a single shipment of stock, we venture to say that it would scarcely occur to him that his peril was augmented by riding in a freight-car in the middle of a train, rather than in the caboose, or that he was in any sense a wrongdoer in riding in the car with the stock, the safe-keeping of which had expressly devolved upon him.

It was said in *Kansas, etc., R. Co.* v. *White* (1895), 67 Fed. 481, 14 C. C. A. 483: "Stockmen, charged with the duty of looking after their stock, may ride in places and positions, may do many things, on the freight-train, without being guilty of negligence, which, if done by one riding on a passenger-train, would undoubtedly constitute negligence." In *Chicago, etc., R. Co.* v. *Lee, supra,* a recovery was upheld where the man in charge of a valuable mare was injured, while traveling in the car with the animal, owing to the derailing of the car. The contract provided that the car should be in sole charge of the shipper and his agent for the purpose of attention and protection to the animal, and that the company assumed no responsibility for the safety of it, whether from theft, heat, jumping from car, or from injury which it might do to itself. In passing on the case, Sanborn, J., said: "What was the meaning of the agreement of the parties in this case? Their contract must, like other agreements, be read and construed in the light of the circumstances surrounding them when they made it; and when it is considered that it was customary for the men in charge of fine animals to ride in the cars with them on this railroad; that the car in which the defendant in error was riding was furnished at Joliet for the transportation of the mare; that the company knew that the defendant in error was to go in charge of

her; that he climbed into the car at Joliet, and rode there until he was injured; that the two conductors through whose charge he passed knew that he was riding in that car before the accident occurred, and made no objection; and that the written contract expressly provided that the car containing the animal was in his sole charge, for the purpose of attention to, and the protection of, the mare during the transportation, and that the company assumed no responsibility for her safety while in his charge, whether from theft, heat, jumping from the car, or injury or damage which she might do to herself—we are constrained to hold that the fair interpretation of this agreement is that it was a contract to carry the defendant in error in the stock-car occupied by the mare from Joliet to Junction City upon his payment of fare from Rock Island to the latter place. If this was the contract, the defendant in error was guilty of no negligence in occupying that car rather than the caboose, because he had the right to rely upon the presumption that the company would use ordinary care to carry him safely in the car in which the contract permitted him to ride." We may also cite, as much in point on the question in hand, *Florida R., etc., Co.* v. *Webster* (1889), 25 Fla. 394, 5 South. 714, and *Fitchburg R. Co.* v. *Nichols* (1898), 85 Fed. 945, 29 C. C. A. 500. The duty and privilege of the man in charge to exercise vigilance in caring for the stock was recognized in the latter case, which involved a contract of shipment precisely similar to the one involved in the case at bar.

Referring to the provisions of said contract, it appears that Teeters is referred to as the "man in charge," as the person "accompanying said stock to take care of the same;" that Teeters (designated as the shipper) was required by the contract not only to load and unload, feed and water the stock but "to take care of the same * * * whilst being transported;" that the company exempted itself from "any liability or duty in refer-

ence thereto, except in the actual transportation of the same;" that it specifically exempted itself from liability for the escape of any of said cattle, or for injuries sustained by "crowding one upon another, kicking or goring, suffocating, fright, burning of hay or straw used for feeding or bedding, or by fire from any cause whatever." There is absolutely nothing in said contract which assumes to provide where the man in charge shall ride, but by the last clause of the bill of lading reference is made to a consideration based on the "carriage of a person or persons in charge of said stock upon a freight-train." The only reference to the caboose is made in connection with stipulations designed to guard the carrier against responsibility for certain kinds of accidents which it is known as a matter of practical experience frequently befall drovers who travel in the caboose.

For a reason to which we have already adverted, and because the bill of lading is the emanation of the carrier, it is clear that it is to be construed *contra proferentem*. An especially important circumstance in this case is the plain sanction which the agent, whom the initial carrier entrusted with the execution of the contract, gave to the act of appellee in riding upon the stock-car. So far as concerns appellant, it must not be forgotten that the contract was a limited-liability contract, made "on behalf of connecting carriers," and it is to be presumed that its terms were assented to by appellant, and formed the basis of carriage over its route. *Adams Express Co.* v. *Harris* (1889), 120 Ind. 73, 7 L. R. A. 214, 16 Am. St. 315; 4 Elliott, Railroads, §1446. This contract, in and of itself, was sufficient to charge appellant with notice that appellee was upon its train in charge of the stock, and the failure to account for him in the caboose would plainly lead to the inference, in view of the duties and responsibilities resting upon appellee, that he was actually in charge of the stock. And espe-

cially is this true in view of the fact that in the transfer at Buffalo the car was hauled for a number of miles and delivered to appellant when there was no caboose attached. It is also difficult from the circumstances to resist the conclusion that those in charge of the train, and to whom notice would be equivalent to notice to the company, were actually apprised of his presence in the stock-car. Upon the matter of the construction of the contract there was nearly five days of acquiescence in the particular mode of construing it which appellee here contends for. In case of doubt such a construction is very influential with the courts. If appellant had knowledge of the manner in which appellee was traveling, it was immaterial that the crew which was engaged in the operation of the train after it left Elkhart did not have such knowledge. *Florida, R., etc., Co.* v. *Webster, supra.* If they were not informed, they should have been.

Since appellee, by his contract, had absolved appellant from its common-law responsibility for the safety of the stock, aside from the mere risk of transportation, it is clear, the stock being valuable, that he had a right, in the absence of any known requirement to the contrary, to be on hand at all times, to protect the property from those dangers which he had absolved the carrier from, and which, as a consequence, were risks which devolved upon him, and if he had a right to be present at all times to protect the property, he is not to be accounted a wrongdoer because, for convenience or otherwise, he elected to stay in a place where he had a right to be.

But, looking at the matter from the standpoint that the company had knowledge that appellee was in the stock-car, we think the company's actions in permitting him to ride there day after day was equivalent to the act of assigning him to that place. This permission was tacit, and if the place was one of hidden peril, which made it improper for him to ride there, there was a duty,

since he was a passenger and could not reasonably be expected to be apprised of dangers of collision as between different parts of a connected train, to warn him of the peril he was in. Note to *Hemmingway* v. *Chicago, etc., R. Co.* (1888), 7 Am. St. 823, 830. And see *Chicago, etc., R. Co.* v. *Arnol* (1893), 144 Ill. 261, 33 N. E. 204, 19 L. R. A. 313; *Chicago, etc., R. Co.* v. *Winters* (1898), 175 Ill. 293, 51 N. E. 901.

If it really could be said that there was any question as to appellee's having been a passenger and the matter in anywise depended upon inferences that might be 17. drawn from the evidence, the question was peculiarly one for the jury. Note to *Illinois Cent. R. Co.* v. *O'Keefe* (1897), 61 Am. St. 68, 103. We are quite within bounds in asserting that appellee was entitled to go to the jury on the question as to whether he was a passenger.

Appellant was not entitled to judgment on the answers to interrogatories. As is well understood, such answers will not overthrow the general verdict unless there 18. is such an antagonism between the two on material questions as to be beyond the possibility of being removed by any evidence legitimately admissible under the issues. *McCoy* v. *Kokomo R., etc., Co.* (1902), 158 Ind. 662.

But two questions remain for our consideration. They relate to rulings of the trial court in the admission of testimony given by appellee for the purpose of showing the extent of his pecuniary loss. The questions and answers which are objected to are as follows: "In the profession of life for which you have fitted yourself, and which was your calling and life-work, you may state to the jury what, at the time of the accident, your services in said profession were fairly and reasonably worth in the market. A. From $1,200 to $1,800 per year. Mr. Teeters, you may state, in the profession for which you have fitted yourself, and

which was your life-calling, at the time of the accident how much you could have earned. A. I should say from $1,200 to $1,500 per year." Before discussing these rulings we may say that there was in evidence at that time the following facts: At the time of the accident appellee was forty years old, and an unusually fine specimen of physical manhood. After graduating from the high school, he had six years at Oberlin and two years at Purdue. His vocation in life was that of a teacher, and his special lines of work were mathematics and civil engineering. He had had considerable experience as an engineer in the field. For three and one-half years he was the principal of the Auburn, Indiana, high school, and for three years, extending up to within less than two months of his injury, he was a teacher of mathematics and superintendent of student labor at Berea College. He did considerable surveying while he was there, for the institution and for third persons. At the time of his injury, he had entered the employ of the Idaho Industrial Institute, to do the same general' lines of work as he had at Berea. Upon entering his new employment he visited eastern cities, at the request of the president of said institution, for the purpose of raising money therefor, and he was returning from that errand when he was injured. It further appears that there was an arid farm of 1,160 acres in connection with said institution, which it was proposed to irrigate; that it was intended to utilize for that purpose a site for an irrigation dam, some fifteen miles away, and that appellee was to do the civil engineering work in connection with the establishment of said dam and the building of the irrigation ditches. Immediately prior to the asking of the questions above set forth, appellee was asked this question: "You may state how much you could earn a year before you were injured." He answered: "I received $800 per year in addition to the amount of surveying I did; that would range from $100 to $400 per year. I was to

receive about $1,200 and all the money that I could make in civil engineering. There would be about two or three months of the year that I could take for that." It will be observed that appellee was answering as to how much he had been earning in the employment which had just terminated and as to the nature of his agreement concerning compensation in his subsisting employment. Appellant's counsel moved to strike out that part of the answer of the witness relative to what he was to receive under contract after he was injured, on the ground that the answer was not responsive, and upon the further ground that that was not the proper manner of proving damages. This motion was sustained.

Appellant's counsel now assert that while it was competent for the appellee to state what his employment was, his fitness for such employment, and all the facts and circumstances which would tend to show his ability to earn money, it was not competent for him to give in evidence his opinion as to the market value of his services, or as to what he was able to earn.

Dealing first with the question as to the testimony as to the fair and reasonable worth of appellee's services in the market, we have to say that there can be absolutely no question as to the right to prove such a fact as applied to some distinct vocation in life, in which the person in question is specially skilled, and concerning which it may be presumed that there exists a demand at a salary or wage compensation. *Johnson* v. *Thompson* (1880), 72 Ind. 167, 37 Am. Rep. 152; *Bowen* v. *Bowen* (1881), 74 Ind. 470; *Cleveland, etc., R. Co.* v. *Gray* (1897), 148 Ind. 266; *Harmon* v. *Old Colony R. Co.* (1897), 168 Mass. 377, 47 N. E. 100; *Whipple* v. *Rich* (1902), 180 Mass. 477, 63 N. E. 5; *Baxter* v. *Chicago, etc., R. Co.* (1893), 87 Iowa 488, 54 N. W. 350; 7 Ency. Evidence, 421, 424; *Gulf, etc., R. Co.* v. *Bell* (1900), 24 Tex. Civ. App. 579, 58 S. W. 614; *International, etc., R.*

*Co.* v. *Locke* (1902), (Tex. Civ. App.), 67 S. W. 1082. Most of the cases cited above are personal injury cases. *Harmon* v. *Old Colony R. Co., supra*, is of that character, and in that case Allen J., speaking for the court, said: "If the plaintiff's services had a market value, in the kind of business in which she was engaged, such market value might be proved to the jury as a fact which they might take into consideration in determining the amount of damages."

As to the remaining question, relative to the admission of testimony as to what appellee could have earned, we have concluded that the case should not be reversed for that reason. It will be observed from the structure of the question that it had to do with his power to earn money at the time of the accident, and therefore that it did not involve any problem of finding work in his vocation. In the next place, appellant had caused an answer (which we have set out above) to be excluded which was strongly calculated to elucidate that very question. The irresponsiveness of the answer was not an objection which could be urged by the appellant, after the answer was fully completed, since it was not examining the witness. The question at that stage was whether the evidence was competent. As to the other objection, we find that appellant's counsel are now, in effect, contending that this was the very class of evidence which was admissible on the subject of damages. It would seem, at the least, that appellant ought not now to be accorded any advantage because it procured a wrong ruling. *Spaulding* v. *Mott* (1906), 167 Ind. —; *Larey* v. *Baker* (1890), 85 Ga. 687, 11 S. E. 800; *Insurance Co.* v. *O'Connell* (1889), 34 Ill. App. 357; *Jobbins* v. *Gray* (1889), 34 Ill. App. 208, 219. In the case last cited it was said: "Appellant cannot be allowed to procure an erroneous ruling in his favor and exclude competent and material evidence on the trial when it is offered and ready to be produced, and then on appeal insist that

for want of that very proof the decree cannot be sustained. A party will never be allowed so to take advantage of his own wrong, or the errors of the court induced on his own motion, and then compel the opposite party to suffer the consequences.  Such a proceeding would be the merest trifling with the court."  Without undertaking to say that the question in hand is fully within the principle laid down in the case last cited, it may be said that it is so far within the influence of that principle that we cannot shut our eyes to the fact that appellee had testified to an arrangement whereby he was to receive about $1,200 a year by teaching, and that he would have two or three months in the year to devote to the work of engineering in connection with the institution.  As to what he would have been able to earn in addition to $1,200, it is to be noted that he does not fix upon any particular sum. "From $1,200 to $1,500 per year" is his answer, thus leaving the estimate of his earnings as a civil engineer ranging from nothing to $300 a year.  What that sum would have been was left to the jury, and if it found that he would have earned any sum in addition to the $1,200, it must be that it fixed the sum, rather than the witness. In addition, it is to be considered that it appears that for the work done during the school year the man was commanding substantially $100 a month, that he had testified that his services were worth in the market from $1,200 to $1,800 a year, that the jury so found in answer to an interrogatory, and that while in the same general employment at Berea, as teacher of mathematics and superintendent of student labor, he had been able to earn from $100 to $400 a year in his work as a surveyor.  All of these matters appeared without dispute, and it seems, therefore, that, with the engineering work existing for him to do, his estimate of from nothing to $300 for such work was not open to question on the evidence.  With every fact in the case in line with the reasonableness of his estimate, with a number

of facts appearing which tended strongly to corroborate him, and considering the just expectation that the jury would have exercised a prevailing common sense in the application of the evidence concerning a class of services that we as judges know pertains to a highly skilled employment, there is certainly no reason to presume error from an answer that left it to the jury to fix the precise sum he would have been able to earn in such subsisting employment. Not only do these circumstances appeal to us as sufficient to prevent a reversal, but when it is considered that appellee's outside estimate as to what he could earn at the time of the accident was really nothing more in substance than testimony as to what would have been the value of his services (the matter being dependent on the problem, which he recognized, as to the extent that he would be able to employ his extra time), and that the validity of his conclusion, based as it was wholly on facts, could have been tested on cross-examination with even more readiness than ordinary testimony as to the value of services, it appears to us that the objection in the concrete involves a non-meritorious technicality and nothing more. Of course, a ruling in the admission of testimony which in any way contravenes a rule of evidence is always a challenge to our consideration as to whether it affords a sufficient ground for a remanding of the cause for a new trial, but, presented as this point is, we feel that a reversal for the reason urged would evince the fact that this court had failed to exercise that practical judgment which is quite as essential in the disposal of a cause on appeal as it is at any other stage of a lawsuit.

Judgment of Whitley Circuit Court affirmed.