## TRIPP v. MICHIGAN CENT. R. CO.

(Circuit Court of Appeals, Sixth Circuit. January 2, 1917.)

No. 2863.

**1. CARRIERS ☞307(3)—"PASSENGER FOR HIRE"—DROVER—CONTRACT.**

Under a contract for the shipment of live stock, which was part of the company's regulations, duly issued and filed with its rate schedules, and which required an attendant to accompany the shipment, and provided that, in consideration of the carriage of the attendant without charge other than the sum paid for the transportation of the live stock, the shipper agreed to indemnify the carrier against 'liability for injuries to the attendant, which contract was accompanied by a release signed by the attendant, stating that, in consideration of his carriage without charge except the sum paid for the carriage of the stock, he assumed all risk of injury and released the carrier from liability therefor whether occasioned by its negligence or not, the attendant was a "passenger for hire," payable in money, not a mere gratuitous passenger, so that the limitation of liability was invalid.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1254; Dec. Dig. ☞307(3).]

**2. CARRIERS ☞189—TRANSPORTATION OF GOODS—RATES—REASONABLENESS.**

Freight rates must be fixed with reasonable reference to the responsibility and the cost and value of the services which the carrier and the shipper undertake respectively to assume and render.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 162, 854, 855, 859–865; Dec. Dig. ☞189.]

**3. COURTS ☞365—RULES OF DECISION—DECISIONS OF STATE COURTS—GENERAL LAW.**

The determination of whether, under a contract for the transportation of live stock and an attendant, the attendant is a passenger for hire, is a question on which the federal courts are not bound by state decisions.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Dec. Dig. ☞365.]

**4. CARRIERS ☞307(6)—TRANSPORTATION OF PASSENGERS—CONTRACT—CLASSIFICATION.**

A provision in a carrier's classification that, with one or more car loads of horses, the owner or agent will be carried free, does not militate against a contract for such shipment, providing that payment for the attendant's transportation is part of the charge for the transportation of the horses.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1257–1259, 1491; Dec. Dig. ☞307(6).]

**5. CARRIERS ☞307(3)—CARRIAGE OF PASSENGERS—DROVER—CLASSIFICATION—"FREE."**

A provision in a carrier's classification that an attendant with a shipment of horses will be carried "free" can be construed to mean only that he is not to be charged an additional fare, so as not to be inconsistent with a contract for such shipment which provides that the freight charge includes the transportation of the attendant within the rule as to limitation of liability.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1254; Dec. Dig. ☞307(3).

For other definitions, see Words and Phrases, First and Second Series, Free.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

238 F.—29

6. CARRIERS ☞307(3)—CARRIAGE OF PASSENGERS—DROVER—DETERMINATION OF RIGHTS.

Unless the contract made between the carrier and the shipper was legally forbidden, the provisions of that instrument, and not the classifications filed by the carrier, determine whether the attendant is carried free or as a passenger for hire.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1254; Dec. Dig. ☞307(3).]

7. CARRIERS ☞35—CARRIAGE OF PASSENGERS—PAYMENT FOR TRANSPORTATION —DROVER.

Under the provisions of the act to regulate commerce (Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 [Comp. St. 1913, § 8569]) requiring the schedules of rates filed by the carrier to state any rules or regulations which in any wise affect or determine any part or the aggregate of the rates, thereby recognizing the difficulty of stating in separate schedules the charges affecting the particular rates, a contract for the shipment of live stock which requires an attendant to accompany it, the charge for his transportation being included in the charge for the transportation of stock, does not violate the provision of the act forbidding compensation for the carriage of passengers to be made in any commodity, or in any form other than money.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. ☞35.]

8. CARRIERS ☞307(3)—TRANSPORTATION OF PASSENGERS—DROVERS—FILING TARIFFS.

Even if a carrier is required to file a separate schedule showing the fares charged for the transportation of live stock caretakers, its failure to do so does not entitle it to treat as a gratuitous passenger a caretaker whom it carries under a uniform contract issued by it and presumed to be based on a fair and reasonable compensation, which provided that his transportation was included in the charge for the transportation of the stock.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1254; Dec. Dig. ☞307(3).]

9. CARRIERS ☞32(1)—TRANSPORTATION OF PASSENGERS—"FREE PASS"—CONTRACT FOR LIVE STOCK SHIPMENT.

A contract issued to a caretaker accompanying a live stock shipment, which provided that the charge for his transportation was included in the charge for the transportation of stock, is not a "free pass" within the Hepburn Act (Act June 29, 1906, c. 3591, § 1, 34 Stat. 586) as amended by Act June 18, 1910, c. 309, § 7, 36 Stat. 546 (Comp. St. 1913, § 8563[5]), permitting a carrier to issue a free pass to such a caretaker, and a provision therein releasing the company from liability for injuries to the caretaker caused by the carrier's negligence is invalid.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 83; Dec. Dig. ☞32(1).

For other definitions, see Words and Phrases, First and Second Series, Free Pass.]

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by Everett A. Tripp against the Michigan Central Railroad Company. Judgment for defendant on directed verdict, and plaintiff brings error. Reversed and remanded, with direction to award a new trial.

L. H. Paddock, of Detroit, Mich., for plaintiff in error.

J. W. Dohany, of Detroit, Mich., for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and Mc-CALL, District Judge.

WARRINGTON, Circuit Judge. Everett A. Tripp brought an action in the court below against the Michigan Central Railroad Company to recover damages for personal injuries claimed to have been sustained by him through negligence of the railroad, and obtained a verdict and judgment in his favor. Later, upon motion of the railroad, the judgment was set aside and a new trial granted. This ruling was based on the decision in Charleston & West. Car. Ry. v. Thompson, 234 U. S. 576, 34 Sup. Ct. 964, 8 L. Ed. 1476, which had been rendered meanwhile. Thereafter, April 22, 1915, under stipulation of counsel, the evidence and record of the former trial were submitted to the court and jury, and, upon motion of the railroad and solely on the authority of the decision in the Thompson Case, the court directed verdict and entered judgment in favor of the railroad. The writ of error is prosecuted to reverse this action of the trial court.

According to the substantial tendency of the proofs taken at the first trial, Tripp, who was a horse dealer, on February 12, 1913, arranged at Chicago with Moses Wilcove to accompany as attendant a carload of horses owned and ready for shipment by Wilcove from Chicago to Utica, N. Y. The shipment was made under a form of instrument which the railroad company had used for some eight years, called a "Uniform Live Stock Contract"; and this was executed by Wilcove and the railroad company. There is indorsed on this contract, and seemingly as part of the contract, a form of release which in terms absolves the railroad company from all damages that might happen to the attendant through the company's negligence. One of the regulations contained in the company's official classification required the person accompanying the live stock to sign this release. Before starting with the shipment, Tripp signed the release and received from the railroad company a duplicate of the contract including the release; and upon this duplicate he was expected and permitted to accompany the carload of horses as the attendant. The injuries for which recovery was allowed at the first trial occurred in the night of February 14th, on a switch at Welland, Ontario, in the regular course of the shipment and through collision between a train of defendant and the way-car, or caboose, in which Tripp was rightfully sitting.

[1] The controlling question concerns the status of plaintiff at the time he received his injuries. Was he, in view of the live stock contract under which he was being carried, a gratuitous passenger or a passenger for hire? The pertinent features of the contract including the release are in substance and effect shown in the margin.[1]

---

[1] (1) The shipper was to pay freight at the "lower published tariff rate," subject to condition that the carrier's liability on the horses should be restricted to an agreed valuation of not exceeding $100 each or $1200 for the carload,

Here we have to consider a contract which, by reason of a reduced freight charge, limits the liability of the carrier respecting injury to the live stock or its loss to an agreed valuation either per head or in gross; exempts the carrier from its ordinary duties and responsibilities touching the sufficiency of the car body and from any sort of care of the stock in transit; requires the presence of an attendant for the live stock, and, "in consideration of the premises and of the carriage" of the attendant "without charge other than the sum paid or to be paid ' for the transportation of the live stock," exacts of the shipper indemnity against liability for personal injury to the attendant regardless of the cause. Whatever else may be said of such a contract as this, it is difficult to perceive why the attendant was not a passenger for hire. It is clear enough that the requirement of an attendant placed the shipper under obligation to the carrier for the fare of the attendant and made the carrier responsible for his safe carriage. The language "without charge other than the sum paid  *  *  *  for the transportation of the live stock" fairly implies that the rate charged for the carriage of the live stock, although reduced, had been fixed so as to include a reasonable fare for the carriage also of the attendant. The provision that the shipper should indemnify the carrier against claims for personal injury to the attendant shows that, as between the carrier and shipper, liability for such injury, as well as for the attendant's fare, was assumed by the shipper. This indemnity is in accord, too, with the other provisions, already pointed out, which were plainly designed to lessen the service and responsibility of the carrier. All these provisions tend to

whether loss or damage should occur "through the negligence" of the carrier or connecting carriers or otherwise.

(2) The shipper was required to inspect and satisfy himself of the sufficiency and safety of the body of the car in which the stock was to be transported; also, at his sole risk and expense, to load and care for the horses, to feed and water them in course of transportation, whether delayed in transit or otherwise, and to unload them; he was to see that all doors and openings of the cars were at all times so closed and fastened as to prevent escape of the stock in the course of transit; and the carrier and connecting carriers were alike exempted from all liability or damages touching the subjects of the duties so imposed upon the shipper.

(3) "Shipments of horses must in all cases be accompanied by an attendant to destination." And "in consideration of the premises and of the carriage of a person  *  *  *  in charge of said stock upon a freight train  *  *  *  without charge other than the sum paid or to be paid for the transportation of the live stock in charge of" the attendant, the shipper in terms bound himself to indemnify the carrier against and save it harmless from all liability "by reason of personal injury sustained" by the attendant, "whether the same be caused by the negligence" of the carrier or any connecting carrier or otherwise. The release provides: "In consideration of the carriage of the undersigned (the attendant) upon a freight train of the carrier  *  *  *  named in the within contract without charge, other than the sum paid or to be paid for the carriage upon said freight train of the live stock mentioned in said contract, of which live stock he is in charge, the undersigned does hereby voluntarily assume all risk of accidents or damage to his person  *  *  *  and does hereby release and discharge the said carrier  *  *  *  from every and all claims,  *  *  *  for or on account of any personal injury  *  *  *  sustained by the undersigned,  *  *  *  whether the same be caused by the negligence" of the carrier or otherwise.

strengthen the implication that the rate charged on the live stock was intended to include the attendant's fare.

[2] Surely, freight rates must be fixed with reasonable reference to the responsibility and the cost and value of the service which the carrier and the shipper undertake respectively to assume and render. Albree v. B. & M. R. R., 22 Interst. Com. R. 303, 316; Boileau v. P. & L. E. R. R. Co., 22 Interst. Com. R. 640, 652. See, also, United States v. Balt. & Ohio R. R. Co., 231 U. S. 274, 293, 34 Sup. Ct. 75, 58 L. Ed. 218; Interstate Com. Comm. v. Diffenbaugh, 222 U. S. 42, 46, 32 Sup. Ct. 22, 56 L. Ed. 83. Indeed, the lower tariff rate can be explained in no other way. The design so to exact fare for the carriage of the attendant and to escape liability for his personal injury is extended into the release. It is there stated that he was to be carried "without charge, other than the sum paid or to be paid for the carriage  *  *  *  of the live stock," and (in addition to the indemnity required of the shipper as stated) that the attendant should assume all risk of personal injury caused by the negligence of the carrier. It is to be borne in mind, moreover, that the contract (including the release) represented not merely the relations between the carrier and the particular shipper and attendant there named, for the contract was typical; it was part of the carrier's official classification; it was duly issued and filed. Looking then to the provisions of the contract as a whole, apart from certain portions of the interstate commerce law which will be considered later, it is clear that the plaintiff was a passenger for hire. This finds ample support in familiar authorities.

In N. Y. Central R. Co. v. Lockwood, 84 U. S. (17 Wall.) 357, 359, 21 L. Ed. 627, a live stock contract was involved which was much like the present one; though it is to be noted that it was not there provided as it is here that the fare of the live stock attendant (the owner in that instance) was included in the rate charged for the carriage of the live stock. The agreement in the Lockwood Case stated its consideration to be the carrying of the plaintiff's cattle at less than tariff rates; the shipper was required to care for his cattle while in transit and also to attend to the loading and unloading of them; and he assumed all risk of injury to the stock and of personal injury to himself or to any attendant who might go with the cattle. The shipper received a drover's pass which certified that the person to whom it was issued had shipped sufficient stock to entitle him to free passage and stated that the acceptance of the pass was to be considered a waiver of all claims for injuries that might be received by the holder while on the train. Mr. Justice Bradley said of this contract and pass:

"It may be assumed in limine that the case was one of carriage for hire; for, though the pass certifies that the plaintiff was entitled to pass free, yet his passage was one of the mutual terms of the arrangement for carrying his cattle. The question is, therefore, distinctly raised, whether a railroad company carrying passengers for hire can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage."

Again, among the conclusions there reached, the fourth one was (84 U. S. [17 Wall.] 384, 21 L. Ed. 627):

"That a drover traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire."

In Baltimore & Ohio, etc., Railway v. Voigt, 176 U. S. 498, 505, 20 Sup. Ct. 385, 387 (44 L. Ed. 560), it was said of the Lockwood decision:

"This case has been frequently followed, and it may be regarded as establishing a settled rule of policy."

True, the answer to the question certified in that case negatived Voigt's right of recovery. The contract required an express company to hold the railroad harmless from liability for injuries sustained by the express company's employés through negligence of the railway. Voigt in turn agreed both to indemnify the express company against any liability it might incur under its indemnity to the railroad company, and also to release the railroad from liability for injuries sustained by him while being transported on the express cars; and in consideration of this agreement of Voigt he was employed as an express messenger. This agreement between the two corporations, the railroad company and the express company, respecting their joint transportation business presented a question manifestly different from the one arising between a carrier and a shipper or passenger for hire; in the former the railroad company is acting outside of, while in the latter it is acting within, the scope of its duty as a common carrier. This distinction is further illustrated in the more recent case of Santa Fé Railway v. Grant Bros., 228 U. S. 177, 184, 185, 33 Sup. Ct. 474, 477 (57 L. Ed. 787), where an agreement similar in principle to that of the express company just mentioned was upheld; but the court distinguished and sanctioned the doctrine of Railway Co. v. Lockwood, Mr. Justice Hughes saying in that connection:

"For these reasons, the common carrier in the prosecution of its business as such is not permitted to drop its character and transmute itself by contract into a mere bailee with right to stipulate against the consequences of its negligence."

And in Pierce Co. v. Wells, Fargo & Co., 236 U. S. 278, 283, 35 Sup. Ct. 351, 353 (59 L. Ed. 576) while sustaining a shipping contract which limited recovery in case of loss or damage to an agreed valuation of the freight shipped, the court again recognized the rule of the Lockwood Case preventing a carrier from limiting its liability for loss through its negligence; Mr. Justice Day saying:

"That contracts for limited liability, when fairly made, do not contravene the settled principles of the common law preventing the carrier from contracting against its liability for loss by negligence (Railroad Co. v. Lockwood, 17 Wall. 357, 375), was settled by this court in what is known as the Hart Case (Hart v. Pennsylvania R. R., 112 U. S. 331 [5 Sup. Ct. 151, 28 L. Ed. 717])."

Thus it would seem safe to say that, so far as it is not in conflict with the interstate commerce law, the rule of the Lockwood Case still prevails as respects the right of an attendant of live stock who travels upon a pass issued in connection with a contract like the one there involved, to be treated, not as a gratuitous passenger, but as

a passenger for hire and so to recover for personal injuries sustained, in spite of his release of the carrier from its acts of negligence.  We may call attention to further decisions to the same effect:  Delaware L. & W. R. Co. v. Ashley, 67 Fed. 209, 212, 14 C. C. A. 368 (C. C. A. 3);  Norfolk Southern R. Co. v. Chatman, 222 Fed. 802, 803, 805, 138 C. C. A. 350 (C. C. A. 4);  Kirkendall v. Union Pac. R. Co., 200 Fed. 197, 200, 206, 118 C. C. A. 383 (C. C. A. 8);  Wiley v. Grand Trunk Ry. of Canada (D. C.) 227 Fed. 127, 128, 129.  And see Fitchburg R. Co. v. Nichols, 85 Fed. 945, 947, 29 C. C. A. 500 (C. C. A. 1).

[3] Although in such a case as this the federal courts are not bound by state decisions (Railroad Co. v. Lockwood, supra, 84 U. S. at pages 363, 368, 21 L. Ed. 627; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 443, 9 Sup. Ct. 469, 32 L. Ed. 788; Chicago, Milwaukee, etc., Railway v. Solan, 169 U. S. 133, 136, 18 Sup. Ct. 289, 42 L. Ed. 688; N. Y. C. & H. R. R. Co. v. Beaham, 37 Sup. Ct. 43, decided by Supreme Court December 4, 1916), yet it is well worth while to consider the following decisions which distinctly hold that, under contracts similar to the present one, the attendant of live stock is a passenger for hire:  Cleveland, Painesville & Ashtabula R. Co. v. Curran, 19 Ohio St. 1, 4, 11, 2 Am. Rep. 362;  I. C. R. R. Co. v. Anderson, 184 Ill. 294, 306, 307, 56 N. E. 331;  Rowdin v. Pennsylvania R. Co., 208 Pa. 623, 627, 628, 57 Atl. 1125;  Weaver v. Ann Arbor R. Co., 139 Mich. 590, 592, 599, 102 N. W. 1037;  Lake Shore, etc., Co. v. Teeters, 166 Ind. 335, 339, 344, 77 N. E. 599, 5 L. R. A. (N. S.) 425;  Louisville & Nashville R. Co. v. Bell, 100 Ky. 203, 206, 211, 38 S. W. 3;  Buckley v. Railroad Co., 113 Me. 164, 166, 169, et seq., 93 Atl. 65, L. R. A. 1916A, 617;  Sprigg's Adm'r v. Rutland R. Co., 77 Vt. 347, 350, 353, et seq., 60 Atl. 143;  Willcox v. Erie Railroad Co. (1914) 162 App. Div. 94, 113, 147 N. Y. Supp. 360.[2]  And the ruling in Heyward v. Boston & Albany Railroad, 169 Mass. 466, 469, 48 N. E. 773, is to the same effect.

It is to be remembered that there is one important difference between the contract involved in the Lockwood Case and the contract here in issue.  The Lockwood contract did not, while the present contract does, provide in express terms that the carriage of the attendant was to be "without charge, other than the sum paid * * * for the transportation of the live stock."  In passing upon language like this in Rowdin v. Pennsylvania R. Co., 208 Pa. 628, 57 Atl. 1126, supra, it was held:

"The contract and the release show that the consideration for the transportation of the plaintiff was included in 'the sum paid or to be paid for the carriage upon said freight train of the live stock mentioned in said contract.'"

The same conclusion respecting similar language was reached in Heyward v. Boston & Albany Railroad, supra, 169 Mass. 469, 48

[2] It is to be observed, however, that in the opinion in the Willcox Case attention is called (page 99 of 162 App. Div., page 360 of 147 N. Y. Supp.), to the settled law of New York, that a person riding on a "drover's pass" is a gratuitous passenger; and see remarks of Mr. Justice Bradley on the New York doctrine in his opinion in the Lockwood Case, 84 U. S. at page 363, et seq., 21 L. Ed. 627,

N. E. 773; also in Lake Shore, etc., Co. v. Teeters, supra, 166 Ind. at pages 340, 341, 77 N. E. 599; and in Willcox v. Erie Railroad Co., supra, 162 App. Div. 113, 114, 147 N. Y. Supp. 360.

[4] It results that if the words "without charge, other than the sum paid * * * for the transportation of the live stock," are to be given their natural meaning, the clear implication is, not only that the attendant here was a passenger for hire, as stated, but also that his fare was to be paid in money. In saying this we do not overlook certain provisions of the classification which at first view might seem to modify at least two of the provisions of the contract. The classification provides, for instance:

"With one, two or three cars of horses or mules, the owner or his agent will be carried free on the same train to take care of the animals. * * *"

And yet the contract, as before pointed out, provides:

"Shipments of horses must in all cases be accompanied by an attendant to destination."

Considering these provisions together, it is plain that the presence of an attendant is exacted; and the portion of the first of these provisions which states that "the owner or his agent will be carried free" may be, and possibly under some other form of contract is, given literal effect by actually carrying the owner or his agent "free"; but this does not militate against the present contract, which in effect provides, as we have said, for payment of the attendant's fare in money.

[5] Another way of reconciling the two provisions concerning the carriage of the attendant is shown in Rowdin v. Pennsylvania R. Co., 208 Pa. at page 629, 57 Atl. at page 1127, where the language of the same court in an earlier case (Pennsylvania R. Co. v. Henderson, 51 Pa. 315, 331) is set out:

"As it is absolutely necessary, in carrying stock, that the persons who have charge of them should be carried by the company, the price paid for the freight includes the cost of transporting the drover, who is not therefore a gratuitous but a paying passenger, and the word 'free' is therefore only true so far as that the conductor is not entitled to charge him separately for his passage."

[6] Further, we think the contract itself, in the form in which it was voluntarily delivered to the attendant, should dominate the present situation. It was executed by the company and the shipper and with reference to the attendant's execution of the release; it constituted the only instrument which was given by the company either to the shipper or the attendant; and it was accepted by the officials in charge of the train on which the horses and the attendant were carried as the sole evidence of the attendant's right to transportation. Unless, then, the railroad company was forbidden to enter into such a contract, it ought not to be open to the company to deny either that Tripp was a passenger for hire or that his fare was paid in money.

[7] We may now turn to the question whether the contract is opposed to the interstate commerce law. If our interpretation of the contract is fairly expressive of its true intendment, it certainly is not

violative of the provision forbidding· compensation for the carriage of passengers to be made in services, commodities, or in any form other than money. Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 476, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Chi. Ind. & L. Ry. Co. v. United States, 219 U. S. 486, 496, 497, 31 Sup. Ct. 272, 55 L. Ed. 305; N. Y. Central R. R. v. Gray, 239 U. S. 583, 586, 36 Sup. Ct. 176, 60 L. Ed. 451. One of the reasons for the rule laid down in these cases is that the requirement to make and publish schedules of uniform passenger rates is inconsistent with receiving pay in any other medium than money. It must be conceded that the record in the instant case fails to show that any separate schedule was made or published by the railroad company showing distinct rates of fare for the carriage of attendants of live stock; but admittedly a schedule in respect of the carriage of live stock was formally adopted and maintained, and we need not repeat that the live stock rates so established were designed to include fares for the carriage of live stock attendants. Is it fatal to the validity of the contract that the fares so included were not separated from the live stock charges and made the subject of a distinct schedule? The "uniform live stock contract" treats the presence of the attendant and his fare as essential elements of the transaction. The transaction is manifestly unrelated to the ordinary passenger traffic; it concerns only live stock and live stock attendants embraced in the freight traffic. The contract involved in the transaction contains rules and regulations which affect the rates charged for the transportation of the live stock; and, as we have seen, this contract was part of the company's official classification and was filed and published as required. The act to regulate commerce provides for "schedules showing all the rates, fares and charges for transportation," and further requires that the schedules state "any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper, or consignee." Act June 29, 1906, c. 3591, § 2, 34 Stat. at page 586 (Comp. St. 1913, § 8569). When the live stock schedule of rates is considered in connection with the "uniform live stock contract" which contains "rules or regulations" requiring the presence of a live stock attendant and the inclusion of his fare in the sum paid for the transportation of the live stock, we do not see why the portions of the act alluded to are not substantially complied with. The necessity of caretakers in the movement of live stock, indeed the unitary character of the transaction, would seem to involve serious difficulty in attempting to separate and distinguish reasonable rates for the carriage alone of the live stock and reasonable fares for the carriage of the caretakers. The very requirement to state in the schedules any rules or regulations affecting rates is in apparent recognition of instances where it is difficult, if not impracticable, to estimate and state in separate schedules reasonable charges as respects the objects so affecting the particular rates. This may be illustrated by the practice of including in through freight rates the cost to the carrier of furnishing transit privileges

(Unlawful Rates in Transporting Cotton by K. C., M. & B. R. R., 8 Interst. Com. R. 121, 135; Lewis Leonhardt & Co. v. Southern Ry. Co., 217 Fed. 321, 324, 325, 133 C. C. A. 237 [C. C. A. 6]); and also by the well-known practice, as also the right, to a reasonable extent, to include in the fares of passengers compensation for the carriage of their accompanying baggage. As Cockburn, C. J., said in Macrow v. Great Western Railway Co., L. R. 6 Q. B. 612, 617:

"The impossibility of traveling without the accompaniment of a certain quantity of luggage for the personal comfort and convenience of the traveler has led from the earliest times to the practice on the part of carriers of passengers for hire of carrying, as a matter of course, a reasonable amount of luggage for the accommodation of the passenger, and of considering the remuneration for the carriage of such luggage as comprehended in the fare paid for the conveyance of the passenger."

See Saunders v. Southern Ry. Co., 128 Fed. 15, 19, 62 C. C. A. 523 (C. C. A. 6); National Baggage Committee v. A. T. & S. F. Ry. Co., 32 Interst. Com. R. 152; C. & R. I. R. R. Co. v. Fahey, 52 Ill. 81, 83, 4 Am. Rep. 587; Wood v. M. C. R. R. Co., 98 Me. 98, 100, 56 Atl. 457, 99 Am. St. Rep. 339; Penna. R. R. Co. v. Knight, 58 N. J. Law, 287, 288, 33 Atl. 845; 3 Hutchinson on Carriers, § 1241.

[8] But even if it were conceded that railroad companies should in every such instance as this file separate schedules showing the fares charged for carrying live stock caretakers, it is to be presumed under the plan this railroad chose to adopt that the fares of the caretakers were both compensatory and uniform, since the contract was one of an established class of instruments; and, whatever was the amount of any given fare, it must have been estimated with reference to the carriage of live stock attendants on freight trains, not passenger trains. Therefore it hardly is conceivable that the company's failure to make and publish a schedule as to fares of caretakers entitles it to treat plaintiff as a gratuitous passenger and to defeat recovery through the provision releasing the company from the consequences of its own negligence; this would permit the company to take advantage of its own wrong in spite of the contractual effort to make the attendant a passenger for hire; moreover, it would seem to be in conflict with the principle of the decision in Southern Pacific Co. v. Schuyler, 227 U. S. 601, 612, 33 Sup. Ct. 277, 43 L. R. A. (N. S.) 901, 57 L. Ed. 662.

[9] We have seen that the court below held that the instant case is ruled by the decision in Charleston & West. Car Ry. v. Thompson, 234 U. S. 576, 577, 34 Sup. Ct. 964, 965 (8 L. Ed. 1476). The course taken by the trial judge was to decide that the "uniform live stock contract" was a "free pass" within the meaning of the Hepburn Act as amended June 18, 1910 (36 Stat. at page 546); for the railroad company delivered only this contract to plaintiff to define his right to transportation. The plaintiff in the case so relied on, Lizzie Thompson, was the wife of an employé of the railroad company, and a free pass exempting the company from liability had been issued to her gratuitiously under the Hepburn Act. We think there is not sufficient analogy between that case and this to justify the conclusion reached below. In the Thompson Case the railroad company issued a free

pass both in form and substance; the railroad company in this case did not; and, as Mr. Justice Holmes said in the course of his opinion in the Thompson Case, "the railroad company was under no obligation to issue the pass." In view of what we have shown in respect of the present contract, discussion would not aid in pointing out the difference between the contract in this case and the free pass in the Thompson Case; the distinction and its breadth and effect are manifest. The present defendant might have exercised its right, as did the defendant in the Thompson Case, to issue a free pass in accordance with the Hepburn Act; but since the defendant here did not see fit to do this and, on the contrary, chose to issue in its place and stead an entirely different instrument, it must have meant to forego its right under the Hepburn Act. We therefore cannot think that the ruling in the Thompson Case could have been intended to govern cases like the present one. Norfolk Southern R. Co. v. Chatman, supra, 222 Fed. at page 807, 138 C. C. A. 350. .

The judgment is reversed, with costs, and the cause remanded with direction to award a new trial.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes