NORTHERN PAC. RY. CO. v. ADAMS et al.

(Circuit Court of Appeals, Ninth Circuit. May 19, 1902.)

No. 707.

1. CARRIERS—FREE TICKET—EXEMPTION FROM LIABILITY.
   A contract exempting a railroad company from liability "for any injury to the person, or for any loss or damage to the property," of the passenger using a free ticket, arising from the negligence of its agents or otherwise, does not extend to the death of the passenger so contracting.

2. DEATH BY WRONGFUL ACT—HEIRS AND PERSONAL REPRESENTATIVES—STATUTORY RIGHT OF ACTION.
   The right of action given by Rev. St. Idaho, § 4100, and 2 Ballinger's Ann. Codes & St. Wash. § 4828, to the heirs or personal representatives of a person whose death is caused by the wrongful act or neglect of another, to recover such damages as may be just, is an entirely new cause of action for damages for the loss sustained by such beneficiaries, and is not dependent on the right of the deceased to maintain an action for the act which caused his death had he survived.

8. CARRIERS—VESTIBULED TRAIN—UNPROTECTED PLATFORM—UNUSUAL SPEED
   —INJURY TO PASSENGER—QUESTIONS FOR JURY.
   A passenger boarded a railroad train which was vestibuled with the exception of a tourist sleeper placed between the day coach and the din-

ing car. This sleeper had no device for inclosing its platforms or guarding persons who might be thereon. The passenger entered the day coach, and went back to the dining car to purchase cigars, and started to return to the day coach. He was not seen, after passing out of the dining car, until his body was found near the track opposite a sharp curve. The train was three hours late. The track contained many sharp curves between the station where deceased boarded the train and the next station. The schedule running time between these stations was 35 minutes, and on this occasion the run was made in 24 minutes. There was testimony that there was unusual lurching of the cars, to such an extent that the mail clerk could do no work, and the news agent could not make his usual trip through the cars. *Held*, that the question of the company's negligence in so running the train with such unprotected platforms thereon was for the jury.

**4. SAME—CONTRIBUTORY NEGLIGENCE.**
The fact that deceased was in the habit of traveling on such trains, and knew that they contained an unvestibuled sleeper, did not deprive him of the right to visit the dining car, or make it negligence on his part to do so, and the question whether he was exercising ordinary care was for the jury.

In Error to the Circuit Court of the United States for the District of Washington.

This was an action to recover damages from the plaintiff in error for the loss sustained through the alleged negligent killing of Jay H. Adams, the husband and father of the defendants in error. A verdict was obtained in the lower court in favor of the defendants in error in the sum of $14,000, and judgment entered for that amount. The case is now before this court upon writ of error to reverse that judgment. See 95 Fed. 938.

It appears that the deceased, Jay H. Adams, was an attorney at law residing at Spokane, Wash., frequently having occasion to travel over the lines of railroad in that section of the country. On November 13, 1898, the deceased, in company with a friend, took the east-bound overland train of the Northern Pacific Railway Company at Spokane about 8 a. m., and continued to ride thereon until the town of Hope, Idaho, was reached, at which point they left the train. They remained in Hope several hours, taking the regular west-bound overland train of the same company for Spokane at 4:15 p. m. of the same day, this train being some three hours and ten minutes late in arriving at Hope. The train consisted of an engine and eight cars, placed in the following order: Engine, mail, baggage, express, smoking car, day coach, tourist sleeper, dining car, and standard Pullman sleeper. These cars were vestibuled, with the exception of the tourist sleeper, which was not only not vestibuled, but had no device whatever for inclosing its platforms or guarding persons who might be upon the same. The deceased, with his friend, boarded the train at either the rear end of the smoking car or the front platform of the adjoining first-class day coach, and proceeded immediately forward into the smoking car, where they took seats. Very shortly after the train left Hope the deceased left the smoking car to go to the dining car for the purpose of getting some cigars. He did go to the dining car, purchased the cigars, and left the dining car again, going in the direction of the smoking car. He did not return to the smoking car, and was not again seen alive. His body, in a somewhat mutilated condition, was found the next day opposite a six degree curve in the railroad track, and between the track and the waters of Pend d'Orielle Lake, at a point about six and a half miles west from the town of Hope.

The complaint charges the railway company with negligence in leaving an opening at the side of the platform of one of the cars of its train unguarded while the train was in motion, and in running its train at a high and dangerous rate of speed around a sharp curve of the track; that by

---

¶ 4. See Carriers, vol. 9, Cent. Dig. § 1384.

reason of this negligence the deceased was thrown from said train and killed; and that the plaintiffs are damaged because of said death in the sum of $100,424.

These charges are denied in the answer, and as matter of affirmative defense it is alleged that the negligence and carelessness of the deceased contributed to and caused his death; that he was perfectly familiar with the trains running on said line, and knew of the unvestibuled car upon said train; that he well knew the nature of the country through which the said train was about to run, and that the track had many sharp curves, and well knew the rate of speed at which the train would run; also that he well knew there would be great risk and danger of being thrown from the train if attempting to pass from one car to another while the train was passing through said country. For a further affirmative defense it was alleged that the deceased was not a passenger for hire, but was a purely gratuitous passenger upon the terms and conditions and subject to the provisions of a free ticket, which terms and conditions were printed on the back of said ticket, and were accepted and agreed to and signed by the deceased before boarding said train. These conditions were as follows: "This free ticket is not transferable, and, if presented by another person than the individual named thereon, or if any alteration, addition, or erasure is made upon it, it is forfeited, and the conductor will take it up and collect full fare." "The person accepting this free ticket agrees that the Northern Pacific Railway Company shall not be liable under any circumstances, whether of negligence of agents or otherwise, for any injury to the person, or for any loss or damage to the property, of the passenger using the same." "I accept the above conditions." It was alleged that under this contract and agreement the railway company owed the decedent no duty whatever as a common carrier toward a passenger for hire, and was therefore not liable for any loss or damage that might have occurred to the plaintiffs by reason of the death of the said Jay H. Adams under the circumstances related. The court sustained a demurrer to this last affirmative defense, holding that as the plaintiffs did not base their demands upon any contract, but complained of a wrong resulting in an injury to them by deprivation of the support, protection, society, and comfort of their husband and father, the question as to the validity of the contract under which the defendant claimed exemption from liability was immaterial. The case proceeded to trial upon the question of negligence, resulting in a verdict against the railway company.

Will H. Thompson and Stephens & Bunn (C. W. Bunn, of counsel), for plaintiff in error.

C. S. Voorhees and Reese H. Voorhees, for defendants in error.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

MORROW, Circuit Judge (after stating the facts as above). The errors assigned are the sustaining of the demurrer to the affirmative defense contained in the answer, the admission of certain testimony at the trial, and the giving of certain instructions to the jury, and refusing to give certain other instructions. The first question, then, for consideration is, what effect, if any, did the contract between the deceased and the railway company have upon the plaintiffs' right of action?

It will be observed that the terms of the contract provided for the exemption of the railroad company from liability "for any injury to the person, or for any loss or damage to the property," of the passenger using the free ticket, caused by the negligence of agents or otherwise. Can this language be construed to relieve the rail-

road company from liability for the death of the person using such ticket, if such death is caused by the negligence of the carrier or its servants? In the first place, if such meaning could be given to the language of the contract, the contract would be void as against public policy. A man's life is not his own, to be disposed of by contract. "A man may not barter away his life or his freedom or his substantial rights." Insurance Co. v. Morse, 20 Wall. 445, 451, 22 L. Ed. 365. The state has an interest in securing the safety and preserving the lives of its citizens. By both the common and the statute law, the state has provided the greatest safeguards for the protection of the lives of its citizens. Negligent killing was manslaughter at the common law and indictable. In many of our states it is similarly regarded, and severe penalties imposed therefor. The expressed permission by the deceased, therefore, that the railroad company might negligently take his life without consequent liability, would have been in violation of both the common and statute law, and a void contract. But the contract in question, in our opinion, does not extend to the death of the party contracting; it is limited to injury to the person and loss to the property of that person. "Injury to the person" and "death of the person" are not synonymous terms. The one presumes a continuation of life, though in an impaired state; the other, the destruction or ending of life. The law will permit a person to contract with reference to the liability of a carrier which affects the person contracting solely, but will not permit him to contract with reference to the statutory liability of the carrier to others, in case of his death through the negligence of the carrier. Clark v. Geer, 86 Fed. 447, 32 C. C. A. 295.

What, then, is the statutory liability of the defendant herein to the representatives of the deceased, if liable at all? By the statute of Idaho, in which state the deceased met with the fatal accident, action for death by wrongful act or neglect is permitted, as follows:

"When the death of a person, not being a minor, is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death; or, if such person be employed by another person who is responsible for his conduct, then, also, against such other person. In every action under this and the preceding section, such damages may be given as, under all the circumstances of the case, may be just." Rev. St. Idaho, § 4100.

And by the statute of Washington, in which state this action was brought, it is provided that:

"When the death of a person is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death. * * * In every such action the jury may give such damages, pecuniary or exemplary, as, under all the circumstances of the case, may to them seem just." 2 Ballinger's Ann. Codes & St. Wash. § 4828.

The action for damages against a party causing the death of another by wrongful act or neglect had its origin in Lord Campbell's Act, 9 & 10 Vict., and that act has served as a model for much of the statutory enactment in this country upon the subject. The principal object of the act and the legislation following it was to meet a supposed defect in the common-law rule that any right of action

which an injured person might have against the person causing the injury abated with his death, and did not survive in favor of his heirs or representatives. An entirely new cause of action was created in favor of certain beneficiaries for damages caused to them by the loss of the deceased in consequence of the wrongful death. It was at first considered that Lord Campbell's act merely provided for a survival to the representatives of the right the deceased would have had to an action for personal injuries had he lived; and, following this construction, many of our state statutes provide that the action will only lie when the death occurred under such circumstances that the deceased, had he lived, would have been entitled to sue. The plaintiff in error contends for this strict construction, even though the statute does not contain any express provision so limiting the right of action; claiming that such a provision is necessarily implied for the purpose of ascertaining the status or relation of the deceased to the person alleged to have committed the wrongful act, and thereby determining what duty such person owed, if any, to the deceased.

The statutes have been variously held to be penal and remedial, and accordingly given strict and liberal constructions. But under the most liberal interpretation implied provisions cannot be introduced into a statute where no ambiguity appears. The intention of the lawmakers is to be determined from the words they employ; and, where statutes have been enacted by certain states omitting provisions which occur in similar statutes in other states, courts have no right to presume that such omission was negligent or unintentional, especially where the language is clear and conclusive without such clauses. In such cases there is nothing to construe. Language bearing a plain import needs no extended construction. In the statutes of both Idaho and Washington the clause limiting the right of action to circumstances which would have permitted the deceased to sue is entirely omitted, and nothing appears elsewhere in the statutes to warrant its insertion by implication. The omission must therefore be considered as unintentional, and the legislative will to be completely expressed without such limiting provision. The right of action given by such statutes is to the heirs or personal representatives of a person killed by the wrongful act of another, not for the injuries or damages caused to the deceased, but for the injuries and damages caused to his heirs or representatives by reason of the loss of the deceased. It cannot be dependent upon the right of the deceased to such an action if living, for it does not come into existence until his death by the wrongful act of another. It then springs into existence, by virtue of the statute, in the heirs or personal representatives, purely and simply because they have been damaged by the wrongful or negligent act of another, the relationship existing between the deceased and the party causing the death having no bearing upon the right of action other than as a circumstance to be considered in determining the degree of negligence. In the case of Munro v. Reclamation Co., 84 Cal. 515, 24 Pac. 303, 18 Am. St. Rep 248, the supreme court of California, in construing a similar statute to those in controversy herein, held

the action given for a death caused by negligence to be a new action, and not the transfer to the representative of the right of action which the deceased person would have had if he had survived the injury. The supreme court of the United States in the case of Railroad Co. v. Dixon, 179 U. S. 131, 135, 21 Sup. Ct. 67, 45 L. Ed. 121, takes the same view. A statute of the state of Kentucky was there under consideration which contained no words of limitation of the right of action given for the death of a person by negligence or wrongful act. The court said: "The cause of action thus created is independent of any right of action the deceased may have had or would have had if he had survived the injury."

Under the statutes of both Idaho and Washington, then, the plaintiffs had a right of action against the defendant railroad company for the just damages to them resulting from the death of the said Jay H. Adams, if his death was caused by the negligence of the railroad company; and this right of action was in no way dependent upon any right existing in the deceased before his death, or which might have accrued to him had he survived.

The plaintiffs claim that the defendant was negligent (1) in running a nonvestibuled car as a part of the train, and (2) in running the train with too great rapidity around a curve in the track. Evidence was introduced in support of these contentions showing that the train which the deceased boarded at the station of Hope was some 3 hours late; that the distance between Hope and the station of Sand Point is 16 miles; that the ordinary schedule time for running between these stations was 35 minutes; that on the afternoon in question this run was made in 24 minutes. For the first half of this distance the track is practically on a level, but contains many curves; in fact, between the 3-mile post out of Hope and the 8-mile post the outline of the track forms a figure similar to three sides of a parallelogram, with the sharp corners cut off by rounding curves, and the general lines being sinuous instead of straight. The engineer in charge of the engine drawing the train on that day testified that in pulling out of Hope a speed of only 20 miles an hour was attained while passing through the yards, but at about one half mile west of Hope the speed was increased to about 35 miles an hour; that this speed was increased to 40 miles an hour, but was decreased at the Pack river trestle, a little beyond the 3-mile post, to perhaps 25 miles an hour. The trestle was about 7,100 feet long. The engineer testified that about 200 or 300 feet before leaving the trestle he started working steam again, and increased the speed again to 35 miles an hour, maintaining this speed until reaching the third mile from the trestle, or about 7½ miles from Hope, when the speed was again increased to about 45 miles an hour at the 10-mile post, in order to carry the train up a light grade there. From the top of the grade a speed of 60 miles an hour was gradually attained, and maintained until necessary to stop at the station of Sand Point. The body of Mr. Adams was found at a point about 1½ miles beyond the Pack river trestle, or about 6½ miles west of Hope, where the sharpest curve of the track between Hope and Sand Point occurs. The air brakes were not used on

approaching the curves before the accident occurred. This testimony of the engineer is not, of course, from any actual record made of the running of the train at that time, but is based upon his experience in running over that line for three years and a half.

The railway mail clerk on the train at the time of the accident, and who had been running over that line for about eight months, testified that when the train had nearly passed over the Pack river trestle he noticed an unusual motion of the car,—such a lurching and swinging that he could not continue with his work, but, to use his own words, "did not do a thing only hold on to keep from being knocked around the car until I got to Sand Point." He stated that the mail sacks piled against the side of the car fell down; that he observed the engine "talking for all she was worth"; and in his judgment the train attained a speed of about 50 miles an hour immediately after leaving the trestle, and that this speed was increased to 60 miles an hour within a mile and a half from the trestle, where the accident occurred.

The news agent, who had been running on that line for over two years, also testified to the unusually high speed of the train between Pack river trestle and Sand Point; that the shaking motion of the train over the crooked road there was so violent as to make him car sick, and he did not make his usual trip through the cars until after leaving Sand Point, finding it too difficult to stand in the aisles. He further stated that the brakeman told him they had orders to make up a certain amount of time between Hope and Sand Point, and that the best thing he could do would be to sit down and hold onto the seat.

A merchant of Hope, accustomed to making the trip over this road to Spokane about twice a month, and Mr. Gabbert, the gentleman who boarded the train with the deceased on that day, both testified to the unusual lurching of the car shortly after leaving the Pack river trestle, and the high rate of speed maintained by the train until reaching Sand Point.

The evidence of running a train at too great speed, and its permission by the railway company's rules, is an element of consideration in determining the question of negligence in a particular case (Railway Co. v. Dixon, 179 U. S. 131, 139, 21 Sup. Ct. 67, 45 L. Ed. 121); and it is of especial importance in this case in considering the advisability or necessity of providing vestibuled platforms over which passengers are permitted to pass while the cars are in motion, and whether, under the circumstances, the omission to make such provision is negligence on the part of the railroad company. It has long been established that common carriers of passengers are bound to exercise the utmost degree of care, diligence, and skill that is practically consistent with the mode of transportation adopted; and, while they are not required to employ every possible preventive which the highest scientific skill might suggest, the law requires such carriers to use the best precautions in known practical use to secure the safety of their passengers. Whether the carrier has done so or not is a question of fact, depending upon the peculiar circumstances of each case, which circumstances are

to be compared and weighed by the jury, and the existence of negligence as a fact decided by them by the application of the principles of reason to such circumstances.

So, in the case at bar, the question whether the defendant railroad company, having announced to the public that it was running a completely vestibuled train, and by advertisement invited the public to patronize the dining car run by it as a part of its train, thereby permitting and in fact inviting the passengers to pass over the various platforms of intervening cars while the train was in motion, was negligent in not providing such platforms with such safeguards as to make passage thereover reasonably safe at all times, taking into consideration the fact that portions of the track to be passed over at a rapid speed contained sharp curves,—this question was necessarily one of fact, and therefore within the province of the jury, under proper instructions from the court. The instructions given by the trial court in this regard were in accord with the established doctrine upon the duty of common carriers to passengers, and with the decision of the jury upon this question we have therefore nothing to do.

In Bronson v. Oakes, 76 Fed. 734, 22 C. C. A. 520, a passenger riding in the rear coach of a vestibuled train left the coach at night to go to the forward end of the train, and, to facilitate his return, left open the door of the sleeping coach in which he was riding. The night was dark, the vestibule was not lighted, and the train was running rapidly. On his return, in passing through the vestibule which led into the coach in which he was riding, he supposed a dim, reflected light from the windows of the sleeper was a light shining through the door of the coach which he had left open, and, proceeding as he supposed to enter the doorway of the coach, he walked through an outside vestibule door, which had been left open, fell from the train, and was seriously injured. The court held that the question of whether the railroad company was negligent or not rested with the jury, and in commenting upon this question said:

"The defendants were under no legal obligation to provide vestibuled trains for their passengers, but, having done so, it was their duty to maintain them in a reasonably safe condition. Railway Co. v. Glover (Ga.) 18 S. E. 406, 414. The purpose of the vestibuled cars is to add to the comfort, convenience, and safety of passengers, more particularly while passing from one car to another. The presence of such an appliance on a train is a proclamation by the company to the passenger that it has provided him a safe means of passing from one car to another, and an invitation for him to use it as his convenience or necessity may require. Whether, having provided vestibuled cars for their passenger trains, it was negligence in the defendants to leave the vestibule connection between two cars without light, and the outside door of the vestibule open without a guardrail or other protection while the train was running rapidly on a dark night, is a question of fact for the jury to determine; and if, upon the facts set out in the complaint, they should find that it was negligence, no court could disturb their finding."

It is claimed by the defendant that the deceased was in the habit of traveling upon these trains, and, having knowledge of the unvestibuled tourist sleeping car which invariably formed a part of the train, was guilty of contributory negligence in passing to and from

the dining car through the unvestibuled car while the train was in motion. The deceased had the right to visit the dining car, and it was not negligence on his part to do so. He was only required to exercise ordinary and reasonable care to avoid injury. In the absence of evidence to the contrary, the law presumes that the deceased did exercise this care, and the burden of proof is then upon the defendant to show by preponderance of evidence that the deceased was guilty of contributory negligence. This was not done by direct proof, and is not inferable from any of the facts established in the case. The testimony indicates that up to the time the deceased was last seen alive he was exercising due care in returning from the dining car to the car in which he was located for the journey. The charge of contributory negligence was therefore a question of fact, to be determined by the jury, in view of all the facts and circumstances of the case.

In Railroad Co. v. Powers, 149 U. S. 43, 13 Sup. Ct. 748, 37 L. Ed. 642, Mr. Justice Brewer, speaking for the court upon the question of contributory negligence, said:

"It is well settled that, where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this, whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men will draw different conclusions from them."

The testimony admitted by the trial court over the objections of the defendant related to the circumstances showing the probable cause of death of Adams, and to the pecuniary loss sustained by the plaintiffs in his death. These objections do not, in our opinion, present any questions involving reversible error, and are not of a character to call for discussion.

The judgment is affirmed.