KIRKENDALL v. UNION PAC. R. CO.

(Circuit Court of Appeals, Eighth Circuit.     October 21, 1912.)

No. 2,353.

1. CARRIERS (§ 307*)—PASSENGERS FOR HIRE—LIVE STOCK—ATTENDANT—IN-JURIES—RELEASE—INVALIDITY.

Defendant carrier agreed to transport certain cattle at less than the regular tariff rate, in consideration of the shipper agreeing to a limitation of the carrier's liability, and agreeing to load, unload, reload, feed, and water the cattle at the shipper's expense, requiring that an attendant accompany the cattle over the route. The attendant was furnished a stock ticket containing a release of liability for injuries, though caused by the carrier's negligence, which he was required to sign before he would be accepted by the carrier or be permitted to accompany the stock. *Held*, that the attendant under such circumstances was a passenger for hire, and that the release from liability was therefore void as against public policy, and was no defense to an action for injuries resulting from the carrier's negligence.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1252–1259, 1491; Dec. Dig. § 307.*

Rights of person traveling on pass, see notes to Chamberlain v. Pierson, 31 C. C. A. 164; Clark v. Geer, 32 C. C. A. 306.]

2. CARRIERS (§ 316*)—INJURIES TO PASSENGERS—RES IPSA LOQUITUR.

In an action for injuries to a passenger for hire by the car in which he was riding being run into by an engine approaching from the rear, proof of the accident was sufficient to establish a prima facie case of negligence on the part of the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1261, 1262, 1283; Dec. Dig. § 316.*]

In Error to the Circuit Court of the United States for the District of Colorado; John A. Riner, Judge.

Action by Lanson B. C. Kirkendall against the Union Pacific Railroad Company. Judgment for defendant, and plaintiff brings error. Reversed, and new trial ordered.

Kirkendall brought this action against the Union Pacific Railroad Company for the purpose of recovering damages for injuries which he received on the morning of February 26, 1903, while he was being transported, as he claims, as a passenger for hire on a train of the railroad company near the town of Sterling, Colo. At the trial of the action, counsel for the railroad company at the close of the evidence for the plaintiff moved the court for a directed verdict. The motion was granted, and Kirkendall has brought the case here, assigning this ruling of the court as error.

The evidence introduced by Kirkendall in the court below established the following facts:

Kirkendall, being in Denver, Colo., on the 25th day of February, 1903, was desirous of visiting relatives in the state of Ohio. He was a stockman himself, and had on that day sold some stock in Denver to Clay, Robinson & Co. He arranged with one Hall, who was the agent of Clay, Robinson

& Co. at Denver, to secure for him a chance to be transported from Denver, Colo., to Omaha, Neb., as a person in charge of stock. As a result of this arrangement, Kirkendall was transported by the railroad company from Denver, Colo., to Omaha, Neb., in charge of two car loads of stock belonging to Lobman & Co. His right to be thus transported was evidenced by a contract, of which the following are the material parts, so far as this case is concerned:

"Union Pacific Railroad Co.

"Limited Liability Stock Contract.

"Read this contract.

"Denver S. Yds. Station, Febry. 25, 1903.

"(Original.)                                                                                 No. 63.

"This agreement, made this 25th day of Febry., 1903, by and between Union Pacific Railroad Company, hereinafter called the carrier, and J. Lobman & Co., of Denver, hereinafter called the shipper:

"Witnesseth: That the said shipper has delivered to the said carrier 2 cars of cattle consigned to J. Lobman & Co. at So. Omaha, destination, via ......, to be transported upon the conditions hereinafter set forth over the line of Union Pacific Railroad to ...... (insert only a station on the U. P. R. R.), and there delivered to the consignee, owner or order, or to such company or carrier (if the stock is to be forwarded beyond said station) whose line may be considered a part of the route to destination, it being understood that in and about the delivery of said stock to such connecting carrier Union Pacific Railroad Company acts only as agent for the consignee or owner, and that the liability of each carrier hereunder shall cease and determine upon delivery of said stock to the next connecting carrier, the consignee or owner.

"It is expressly agreed that this contract and the responsibility of all the carriers over whose line the shipment may pass is limited and controlled by the conditions herein contained, which are hereby agreed to by the shipper, and by him accepted for himself and his assigns as just and reasonable. It is further agreed and understood that the person delivering to this company the shipment or any part thereof described herein is authorized to sign this contract for and on behalf of the shipper, with full power in the premises.

| No. of Way Bill. | Car. | |
| --- | --- | --- |
| | No. | Initial |
| 162................................. | 12690 | O. S. L. |
| 163................................. | 12672 | O. S. L. |

"This document must be presented without alteration or erasure.

"Said shipper, for himself, the consignee or owner, agrees to pay or guarantee the freight thereon at the rate of $...... per standard car of 29 to 30½ ft. in length (subject to established per cent. decrease or increase applicable to cars of less or greater length), or $...... per hundred pounds (subject to established minima for cars of varying lengths) as shown by limited liability tariffs governing, which rate is less than the regular tariff rate for the transportation of live stock at carrier's risk, and is given said shipper at his special request, in part consideration of his agreement to the limitation of the liability of the railroad company as a common carrier upon the terms and conditions herein set forth, which are accepted and agreed to by the shipper as just and reasonable; it being understood that each and every condition of this agreement shall inure to the benefit of each and every carrier over whose line said stock may pass under this contract.

"In consideration of the special reduced rate herein provided for the transportation of the live stock above described, it is hereby stipulated and agreed as follows:

"1. The carriers shall not be liable for the loss or death of, or for any in-

juries received by any of said stock, unless the same is the direct result of willful misconduct or actual negligence of said carriers, their agents, servants or employés.

"2. It is expressly agreed that the value of the live stock to be transported under this contract does not exceed the following mentioned sums, to wit:

Horses, mules or jacks, not exceeding.............. $— per head.
Oxen, bulls or steers, not exceeding.................. $50 per head.
Cows, not exceeding................................... $35 per head.
Hogs or calves, not exceeding........................ $10 per head.
Sheep or lambs, not exceeding...................... $— per head.

"And in no event shall the carrier's liability exceed $1,000 upon any car load, such valuations being those whereon the rate of compensation to said carriers for their services and risk connected with the transportation of said live stock is based.

"3. The shipper agrees to load, unload and reload all said stock at his own expense and risk, and to feed, water and tend the same at his own expense and risk while it is in any stockyards, whether the same be operated, owned or controlled by said carriers or otherwise, and while on the cars or at feeding points, at or any place where the same may be unloaded for any purpose whatever.

"4. The shipper assumes the exclusive duty of properly and securely fastening said stock in the cars, and of removing them therefrom and of keeping such cars, and any inclosure in which said stock may be confined, securely locked or fastened so as to prevent escape of stock therefrom. The shipper agrees to inspect the cars in which said stock is to be transported, and any yards or inclosure on the premises of the railroad company into which said stock may be unloaded and satisfy himself that they are sufficient and safe and in proper order and condition, and shall report to the agent or employés of said carrier any visible defects therein, and demand necessary repairs before proceeding to occupy said cars or inclosures, and the fact of his loading said stock into said cars or occupying said inclosure shall be an acknowledgment and acceptance by him of the sufficiency and suitability in every respect of said cars and inclosures for the shipment and yarding thereof; and he hereby assumes all risk of injury which said live stock or any of them may receive in consequence of any of them being wild, unruly, weak, maiming each other or themselves, by or in consequence of heat or suffocation, or any other ill effects of being crowded or injured, by the burning of straw, hay or other material loaded with or used for feeding the stock or otherwise, and also all risk of damage which may be sustained by reason of delay in transportation, and all risk of escape of any portion of said stock, or loss or damage from any other cause or thing not resulting from the willful negligence of the carriers, their officers, agents or employés.

"5. If the carriers or any of them shall furnish any laborer or laborers to assist in loading or unloading said stock at any point, no additional charge being made therefor, such laborer or laborers shall while so engaged be deemed exclusively the employés of the shipper, and no carrier shall in any event be liable for any act or thing done or omitted to be done by such laborer or laborers in connection with said stock while so engaged."

"8. The shipper expressly agrees to load, unload, and care for said stock while upon the cars or premises of the carriers in a careful and humane manner, in strict compliance with the laws of the United States and of each and every state through which said stock may be transported."

"10. The rules, regulations and conditions prescribed by the carriers for the transportation of live stock, as evidenced by their published tariffs, classifications and circulars in force and effect, are binding upon the shipper. The signing of this contract by the shipper or his agent shall be conclusive evidence of knowledge, assent and agreement to each and every stipulation and condition thereof by said shipper.

"Witness my hand.

"[Signed]                     L. B. C. Kirkendall, Shipper.
                        "Union Pacific Railroad Company,
                              "By L. J. Burns, Station Agent."

"Original Union Pacific Railroad Company Limited Liability
Live Stock Contract.

"Executed by L. J. Burns. At Denver U. S. Yds. ...... Station ......
$2/_{25}$ ...... 1903 for ...... 2 ...... cars of ...... cattle ...... good for
transportation of L. B. C. Kirkendall. [Billing Agent.] [Stamp here.]

"From Denver to So. Omaha, when accompanying the stock herein described and not otherwise.

### "Release for Man or Men in Charge.

"In consideration of the carriage of the undersigned upon a freight train
of the carrier or carriers named in the within contract, without charge other
than the sum stipulated therein, for the carriage of the live stock mentioned
therein, the undersigned in charge do hereby voluntarily assume all risk of
accident or damage to his (or their) person or property, and do hereby release and discharge the said carrier or carriers from every and all claim,
liability and demand of every kind, nature and description, for or on account
of any personal injury or damage of any kind sustained by the undersigned
so in charge of said stock, whether the same be caused by the negligence of
the said carrier or carriers or any of its or their employés or otherwise.

"[Signed]  L. B. C. Kirkendall.
[Signature of man or men in charge.]
"[Signed]  L. J. Burns, Witness.

"The man or men who may be entitled to return transportation free or at
a reduced rate under carrier's rules in effect, published and posted as required by law, at the time this contract was executed, will upon surrender
of this contract to the carriers' agent at destination, within 30 days from
date of executing the within contract, receive ticket or tickets for the return
journey."

In connection with the contract, Kirkendall helped load the cattle at Denver, Colo., and they were unloaded and fed at Grand Island, Neb. Kirkendall accompanied the cattle through to Omaha, Neb. At or near Sterling,
Colo., on the morning of February 26, 1903, the caboose attached to the stock
train in which Kirkendall was being carried was run into by an engine and
cars from behind, and as a result thereof he was personally injured.

John Hipp, of Denver, Colo. (Ralph Talbot, of Denver, Colo., on the brief), for plaintiff in error.

C. C. Dorsey, of Denver, Colo. (William V. Hodges, of Denver, Colo., and John N. Baldwin, on the brief), for defendant in error.

Before CARLAND, Circuit Judge, and W. H. MUNGER, District Judge.

CARLAND, Circuit Judge (after stating the facts as above). By the express terms of the contract it was agreed and understood that Kirkendall was authorized to sign the same for and on behalf of the shipper, with full power in the premises. Under the terms of the contract and the evidence introduced at the trial, Kirkendall was the employé and agent of Lobman & Co. It appears clearly from the contract that the railroad company agreed to transport the two cars of cattle at less than the regular tariff rate in consideration of Lobman & Co. agreeing to the limitation of the liability of the company as a common carrier, and further agreeing that they would load, unload, and reload the cattle at their own expense and risk, that they would feed, water and tend the same at their own expense and risk, and that they would perform the other innumerable duties with reference to the transportation thereof prescribed by the contract to be performed by the shipper.

It now becomes pertinent to inquire: How was Lobman & Co. to perform the provisions of the contract on their part to be performed? Manifestly, they must furnish a man or men to care for the stock and to perform the other duties required by the contract to be performed by them, and the contract provided for just such services. The contract did not provide that the owner of the cattle should personally accompany and take care of the same, and this would in a great majority of cases be impossible; so that the fact that Kirkendall had no interest in the cattle as owner cannot affect the question to be decided. The railroad company, having placed the burden of caring for the stock upon Lobman & Co., agreed that it would transport Kirkendall when accompanying the stock in question from Denver to Omaha without charge other than the sum stipulated for the carriage of the live stock. The transaction, stated in a few words, was this: The railroad company, in consideration of the payment by Lobman & Co. of the limited liability tariff, the agreement by them to the limitation of the liability of the railroad company as a common carrier, and the assumption by them of the care of the stock, agreed to transport the two cars of stock, and Kirkendall, the man in charge, from Denver to Omaha. It is argued that the shipment of the cattle under the limited liability contract was purely voluntary on the part of Lobman & Co.—that they could have paid the regular tariff, and thereby held the railroad company to all its common-law or statutory liability as a common carrier, including, of course, the care of the cattle. We do not think it is proper to inquire as to what the parties might have done. They made a contract by which the liability of each party must be determined, and not by some contract that they might have made. The contract which was made required Lobman & Co. to care for the cattle, and they could not obtain the transportation for a man or men to perform this service, except such man or men signed such a release of liability as that which Kirkendall signed. We do not think it is putting it too strongly to say that Kirkendall was required to sign the release, if such fact has any relevancy in determining the validity of the same.

[1] We think this case must be ruled by Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627, and that the decision in that case requires us to hold that Kirkendall was a passenger for hire when he was injured, and that the release of liability signed by him was void as being against public policy. The facts in the Lockwood Case, as they are stated in the report of the case, were as follows: Lockwood, a drover, was injured while traveling on a stock train of the New York Central Railroad Company proceeding from Buffalo to Albany, and brought suit to recover damages for the injury. He had cattle in the train, and had been required at Buffalo to sign an agreement to attend to the loading, transporting, and unloading of them, and to take all risk of injury to them, and of personal injury to himself, or to whomsoever went with the cattle, and he received what is called a drover's pass; that is to say, a pass certifying that he had shipped sufficient cattle to pass free to Albany, but declaring that the acceptance of the pass was to be considered a waiver of all claims for dam-

ages or injuries received on the train. The agreement stated its consideration to be the carrying of the plaintiff's cattle at less than tariff rates. Mr. Justice Bradley delivered the opinion of the court, and after a careful and exhaustive review of the decisions the Supreme Court came to the following unanimous conclusions:

"First. That a common carrier cannot lawfully stipulate for exemption from responsibility, when such exemption is not just and reasonable in the eye of the law.

"Secondly. That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants.

"Thirdly. That these rules apply both to carriers of goods and carriers of passengers for hire, and with special force to the latter.

"Fourthly. That a drover traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire."

The opinion concludes with the following language:

"We purposely abstain from expressing any opinion as to what would have been the result of our judgment, had we considered the plaintiff a free passenger, instead of a passenger for hire."

In the case of Railway Co. v. Stevens, 95 U. S. 655, 24 L. Ed. 535, the facts were as follows: Stevens, being the owner of a patented car-coupling, was negotiating with the defendant railway company, at Portland, Me., for its adoption and use by the latter, and was requested by the defendant to go to Montreal to see the superintendent of its car department in relation to the matter; the defendant offering to pay his expenses. The plaintiff consented to do this, and, in pursuance of the arrangement, he was furnished with a pass to carry him in defendant's cars. This pass was in the usual form of free passes. On its back was the following printed indorsement:

"The person accepting this free ticket, in consideration thereof, assumes all risk of all accidents, and expressly agrees that the company shall not be liable, under any circumstances, whether of negligence by their agents or otherwise, for any injury to the person, or for any loss or injury to the property, of the passenger using the ticket. If presented by any other person than the individual named therein, the conductor will take up this ticket and collect fare."

The plaintiff testified that he put the ticket into his pocket without looking at it. During the passage from Portland to Montreal, the car in which the plaintiff was riding ran off the track and was precipitated down an embankment, and he was much injured. Mr. Justice Bradley again delivered the opinion of the court, and in his opinion said:

"It is evident that the court below regarded this case as one of carriage for hire, and not as one of gratuitous carriage, and that no sufficient evidence to go to the jury was adduced to show the contrary, and hence that under the ruling of this court in Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627, it was a case in which the defendant, as a common carrier of passengers, could not lawfully stipulate for exemption from liability for the negligence of its servants. In taking this view, we think the court was correct. The transportation of the plaintiff in the defendant's cars, though not paid for by him in money, was not a matter of charity nor of gratuity in any sense. It was by virtue of an agreement, in which the mutual interest of the parties was consulted. It was part of the consideration for which

the plaintiff consented to take the journey to Montreal. His expenses in making that journey were to be paid by the defendant, and of these the expense of his transportation was a part. The giving him a fee pass did not alter the nature of the transaction. The pass was a mere ticket, or voucher, to be shown to the conductors of the train, as evidence of his right to be transported therein. It was not evidence of any contract by which plaintiff was to assume all the risk; and it would not have been valid if it had been. In this respect it was a stronger case than that of Lockwood's. There the pass was what is called a 'drover's pass,' and an agreement was actually signed, declaring that the acceptance of the pass was to be considered as a waiver of all claims for damages or injury received on the train. The court rightly refused, therefore, in the present case, to charge that the plaintiff was traveling upon the conditions indorsed on the pass, or that, if he traveled on that pass, the defendant was free from liability. And the court was equally right in refusing to charge that, if the plaintiff was a free or gratuitous passenger, the defendant was not liable. The evidence did not sustain any such hypothesis. It was uncontradicted, so far as it referred to the arrangement by virtue of which the journey was undertaken."

Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, was a case involving the validity of a contract contained in bills of lading for a shipment of certain cotton, and exempting the carrier for loss from certain express perils, whether arising through negligence, default, or error in judgment of the crew or others. The cotton was lost by reason of the stranding of the vessel on the west coast of Great Britain on account of negligence in the parties handling the same. Mr. Justice Gray delivered the opinion of the court, and said:

"We are, then, brought to the consideration of the principal question in the case, namely, the validity and effect of that clause in each bill of lading by which the appellant undertook to exempt itself from all responsibility for loss or damage by perils of the sea, arising from negligence of the master and crew of the ship.

"The question appears to us to be substantially determined by the judgment of this court in Railroad Co. v. Lockwood, 17 Wall. 357 [21 L. Ed. 627]."

And after a careful analysis of the opinion of the court in the Lockwood Case he further said:

"This analysis of the opinion in Railroad Co. v. Lockwood shows that it affirms and rests upon the doctrine that an express stipulation by any common carrier for hire, in a contract of carriage, that he shall be exempt from liability for losses caused by the negligence of himself or his servants, is unreasonable and contrary to public policy, and consequently void. And such has always been the understanding of this court, expressed in several later cases. Express Co. v. Caldwell, 21 Wall. 264, 268 [22 L. Ed. 556]; Railroad Co. v. Pratt, 22 Wall. 123, 134 [22 L. Ed. 827]; Bank of Kentucky v. Adams Express Co., 93 U. S. 174, 183 [23 L. Ed. 872]; Railroad Co. v. Stevens, 95 U. S. 655 [24 L. Ed. 535]; Hart v. Pennsylvania Railroad, 112 U. S. 331, 338 [5 Sup. Ct. 151, 28 L. Ed. 717]; Phœnix Ins. Co. v. Erie & W. Transportation Co., 117 U. S. 312, 322 [6 Sup. Ct. 1176, 29 L. Ed. 873]; Inman v. South Carolina Railway, 129 U. S. 128 [9 Sup. Ct. 249, 32 L. Ed. 612]."

In Baltimore & Ohio Southwestern Railway Co. v. Voigt, 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, the judges of the Circuit Court of Appeals for the Sixth Circuit certified the following question to the Supreme Court of the United States for its instruction:

"Question.

"A railroad company, engaged as common carrier in the business of transporting passengers and freight for hire, entered into a contract in writing with an express company authorized by law to do and actually doing the business known as express business, by which contract the railroad company agreed, solely upon the considerations and terms hereinafter mentioned, to furnish for the exclusive use of such express company, in the conduct of its said express business over said railway company's lines, certain privileges, facilities, and express cars to be used and employed exclusively by said express company in the conduct of such express business, and to transport said cars and contents, consisting of express matter, in its fast passenger trains, together with one or more persons in charge of said express matter, known as express messengers, for that purpose to be allowed to ride in said express cars, and to transport such express messengers for the purposes and under the circumstances aforesaid free of charge. And by said contract it was agreed on the part of said express company to pay said railroad company for such privileges and facilities, and for the furnishing and use of said express car or cars, and for such transportation thereof, a compensation named in said contract, and by which contract it was further agreed by the express company to protect the railroad company and hold it harmless from all liability it might be under to employés of the express company for any injuries sustained by them while being so transported by said railroad company, whether the injuries were caused by negligence of the railroad company or its employés or otherwise. A person made application to said express company in writing to be employed by it as express messenger on the railroad of a company, between which and such express company a contract as aforesaid existed, and such applicant, pursuant to the application aforesaid, was employed by said express company under a contract in writing, signed by him and it, whereby it was agreed between him and such express company that he did assume the risk of all accident or injury he might sustain in the course of said employment, whether occasioned by negligence or otherwise, and did undertake and agree to indemnify and hold harmless said express company from any and all claims that might be made against it arising out of any claim or recovery on his part for any damages sustained by him by reason of any injury, whether such damage resulted from negligence or otherwise, and to pay said express company on demand any sum which it might be compelled to pay in consequence of any such claim, and to execute and deliver to said railroad company a good and sufficient release under his hand and seal of all claims and demands and causes of action arising out of or in any manner connected with said employment, and expressly ratified the agreement aforesaid between said express company and said railroad company.

"Does said railroad company assume, toward such express messenger while being carried in the course of his said employment in one of said express cars attached to a passenger train of said railroad company, pursuant to the contracts aforesaid, the ordinary liability of a common carrier of passengers for hire, so as to render said railroad company liable as such to said express messenger, notwithstanding the contracts aforesaid, for injuries he might sustain by reason of a collision between the train to which said express car is attached and another train of said railroad company, caused by the negligence of employés of the railroad company?"

The Supreme Court in an opinion delivered by Mr. Justice Shiras answered the above question in the negative; but in the course of the opinion it was expressly held that the Supreme Court adhered to the rule enunciated in the Lockwood Case, and said that the principles declared in Railroad Co. v. Lockwood, Railway Co. v. Stevens, and Liverpool Steam Co. v. Phenix Insurance Co., supra, were salutary, and that the Supreme Court had no disposition to depart from them —showing conclusively, in our opinion, that the court did not intend

in any way to overrule or modify the rule laid down in those cases. It was further said in the opinion in the Voigt Case:

"Upon these principles we think the law of to-day may be fairly stated as follows: (1) That exemptions claimed by carriers must be reasonable and just; otherwise, they will be regarded as extorted from the customers by duress of circumstances, and therefore not binding. (2) That all attempts of carriers, by general notices or special contract, to escape from liability for losses to shippers, or injuries to passengers, resulting from want of care or faithfulness, cannot be regarded as reasonable and just, but as contrary to a sound public policy, and therefore invalid."

In Northern Pacific Railway Co. v. Adams, 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513, the facts were that Jay H. Adams resided at Spokane, Wash. On November 13, 1898, he, with a friend, started on one of the trains of the Northern Pacific Railway Company from Hope, Idaho, to Spokane. Shortly after leaving Hope, Adams, then in the smoking car, went back to the dining car for cigars. To reach the dining car, he passed through the day coach and the tourist sleeper. After buying cigars, he left the dining car and went forward. This was the last seen of him alive. His body was found the next day opposite a curve in the railroad track about six miles west of Hope. He was riding on a free pass, upon which appeared the following language signed by Adams:

"The person accepting this free ticket agrees that the Northern Pacific Railway Company shall not be liable, under any circumstances, whether of negligence of agents or otherwise, for any injury to the person, or for any loss or damage to the property, of the passenger using the same.
"I accept the above conditions."

The heirs of Adams brought suit against the railway company, and recovered a verdict and judgment, which were sustained by the Court of Appeals for the Ninth Circuit (54 C. C. A. 196, 116 Fed. 324), and thereupon the case was taken to the Supreme Court of the United States on writ of certiorari. The Supreme Court, in deciding the case, arrived at the conclusion that when a railroad company gives gratuitously, and a passenger accepts, a pass, the former waives its rights as a common carrier to exact compensation; and, if the pass contains a condition to that effect, the latter assumes the risks of ordinary negligence of the company's employés, and the arrangement is one which the parties may make, and no public policy is violated thereby. And if the passenger is injured or killed while riding on such a pass gratuitously given, which he has accepted with knowledge of the conditions therein, the company is not liable therefor, either to him or to his heirs, in the absence of willful or wanton negligence. An examination of the opinion of Mr. Justice Brewer in the Adams Case conclusively demonstrates that the ruling was based upon the ground that Adams was not a passenger for hire and had voluntarily entered into the contract which exempted the company from liability. The Lockwood Case is referred to, and it was said in the opinion of the court:

"He [Adams] was not a passenger for hire, such as was held to be the condition of the parties recovering in Railroad Co. v. Lockwood, 17 Wall. 357 [21 L. Ed. 627], and Railway Co. v. Stevens, 95 U. S. 655 [24 L. Ed. 535]."

In Cau v. Texas & Pacific Railway Co., 194 U. S. 427, 24 Sup. Ct. 663, 48 L. Ed. 1053, the Lockwood Case is referred to and approved; but the court held in the case cited that, so long as there is no stipulation for an exemption from liability on the part of a common carrier which is not just and reasonable in the eye of the law, the responsibility of the carrier may be modified by contract. Charnock v. Texas & Pacific Railway Co., 194 U. S. 432, 24 Sup. Ct. 671, 48 L. Ed. 1057, is to the same effect.

We are unable to reach the conclusion, from an examination of the decisions of the Supreme Court since the Lockwood Case, that it has in any way modified or overruled the same. On the contrary, it would seem that the Justices who have delivered the opinions of the court have taken care to make it plain that the Lockwood Case still declares the law as to cases within the facts in that case, and we think the case under consideration is such a case. It would be unprofitable to review the conflicting decisions of the state courts, as we must in any event follow the rule declared by the Supreme Court of the United States; but the following authorities clearly sustain the proposition that Kirkendall, under the circumstances of this case, was a passenger for hire: Delaware, L. & W. R. Co. v. Ashley, 67 Fed. 209, 14 C. C. A. 368; C., P. & A. R. R. Co. v. Curran, 19 Ohio St. 1, 2 Am. Rep. 362; Pennsylvania Co. v. Greso, 79 Ill. App. 127; N. Y., C. & St. L. R. R. Co. v. Blumenthal, 160 Ill. 40, 43 N. E. 809; I. C. R. R. Co. v. Beebe, 174 Ill. 13, 50 N. E. 1019, 43 L. R. A. 210, 66 Am. St. Rep. 253; O. & M. Ry. Co. v. Selby, 47 Ind. 471, 17 Am. Rep. 719; Lake Shore, etc., R. Co. v. Teeters, 166 Ind. loc. cit. 344, 77 N. E. 599, 5 L. R. A. (N. S.) 425; L. & N. R. R. Co. v. Bell, 100 Ky. 203, 38 S. W. 3; Pennsylvania R. R. Co. v. Henderson, 51 Pa. 315; Rowdin v. Pennsylvania R. Co., 208 Pa. 623, 57 Atl. 1125, 1126; Flinn v. Phil., Wil. & Balt. R. Co., 1 Houst. (Del.) 469; Feldschneider v. C., M. & St. P. R. Co., 122 Wis. 423, 99 N. W. 1034; Mo. Pac. Ry. Co. v. Ivy, 71 Tex. 409, 9 S. W. 346, 1 L. R. A. 500, 10 Am. St. Rep. 758; Moulton v. St. P., M. & M. R. Co., 31 Minn. 85, 16 N. W. 497, 47 Am. Rep. 781.; Saunders v. Southern Pacific Co, 13 Utah, loc. cit. 284, 285, 44 Pac. 932; L. R. & Ft. Smith Ry. v. Miles, 40 Ark. loc. cit. 320, 48 Am. Rep. 10; Carroll v. M. P. R. Co., 88 Mo. 239, 57 Am. Rep. 382; Spriggs, Adm'r, v. Rutland R. Co., 77 Vt. 347, 60 Atl. 143; Weaver v. Ann Arbor R. Co., 139 Mich. 590, 102 N. W. 1037, 5 Ann. Cas. 764; Maslin v. B. & O. R. R. Co., 14 W. Va. 180, 35 Am. Rep. 748; Hutchinson on Carriers (3d Ed.) vol. 2, § 1003; Elliott on Railroads (2d Ed.) vol. 4, § 1605; Moore on Carriers, c. 19, § 17, p. 571.

[2] At the time counsel for the railroad company moved for a directed verdict nothing was said in regard to there being a want of evidence, as to the negligence of the railroad company. The point, however, is made in this court that the evidence of the plaintiff did not show negligence. If we are right in holding that Kirkendall was a passenger for hire at the time of his injury, then we think that it necessarily follows that a prima facie case of negligence was made when it was shown that the car in which he was riding was run

into by an engine and train from behind. It is said that there is no proof that it was an engine and train of the defendant company. In Gleeson v. Virginia Midland Railroad Co., 140 U. S. 443, 11 Sup. Ct. 862, 35 L. Ed. 458, it was said by Mr. Justice Lamar, in delivering the opinion of the court:

"Since the decisions in Stokes v. Saltonstall, 13 Pet. 181 [10 L. Ed. 115], and Railroad Co. v. Pollard, 22 Wall. 341 [22 L. Ed. 877], it has been settled law in this court that the happening of an injurious accident is in passenger cases prima facie evidence of negligence on the part of the carrier, and that (the passenger being himself in the exercise of due care) the burden then rests upon the carrier to show that its whole duty was performed, and that the injury was unavoidable by human foresight. The rule announced in those cases has received general acceptance, and was followed at the present term in Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551 [11 Sup. Ct. 653, 35 L. Ed. 270]." "The law is that the plaintiff must show negligence in the defendant. This is done prima facie by showing, if the plaintiff be a passenger, that the accident occurred. If that accident was in fact the result of causes beyond the defendant's responsibility, or of the act of God, it is still none the less true that the plaintiff has made out his prima facie case. When he proves the occurrence of the accident, the defendant must answer that case from all the circumstances of exculpation, whether disclosed by the one party or the other. They are its matter of defense. And it is for the jury to say, in the light of all the testimony, and under the instructions of the court, whether the relation of cause and effect did exist, as claimed by the defense, between the accident and the alleged exonerating circumstances."

We think the evidence introduced on the part of the plaintiff made a prima facie case of negligence, and that the court committed error in directing a verdict for the defendant.

The judgment below is reversed, and a new trial ordered.