SOUTHERN TRACTION CO. v. HULBERT et al. (No. 7338.) †

(Court of Civil Appeals of Texas. Dallas. May 15, 1915. Rehearing Denied June 19, 1915.)

1. DEATH ☞99—DAMAGES—AMOUNT—SUFFICIENCY OF EVIDENCE.

On appeal from a judgment for $12,000 in an action by a wife for death of her husband in a collision between two street railroad cars, evidence *held* sufficient to sustain the amount of the verdict.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. ☞99.]

2. DEATH ☞95—DAMAGES—WAGES AS MEASURE.

In an action for death by wrongful act, while the law gives compensation only for pecuniary loss by estimating the money value of the life of the relative, nevertheless the pecuniary value of a parent and husband to his wife and children is beyond the amount of his wages in employment, and so is not strictly measured thereby.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108, 109, 111–115, 120; Dec. Dig. ☞95.]

3. APPEAL AND ERROR ☞1001 — REVIEW — VERDICT.

The appellate court cannot disturb a verdict which is supported by substantial evidence. Reversal may be had only when the evidence preponderates against the verdict so that it may be said to be clearly wrong, and to show that the jury was actuated by partiality, passion, or prejudice.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. ☞1001.]

4. DEATH ☞67—DAMAGES—EVIDENCE—MARKET VALUE OF DECEASED'S SERVICES—"VALUE"—"MARKET VALUE"—"ACTUAL VALUE."

Where a wife sued a street railroad for the wrongful death of her husband, who had been engaged in managing his father's country newspaper since the latter's retirement, evidence that the reasonable market value of the services of such a manager as the deceased for running such a paper was from $150 to $200 a month was admissible on the point of damage; such testimony proving the "actual value" of deceased's services, since "actual value," "value," and "market value" are interchangeable terms.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 88; Dec. Dig. ☞67.]

For other definitions, see Words and Phrases, First and Second Series, Actual Value; Market Value; Value.]

5. EVIDENCE ☞543 — EXPERT OPINION — QUALIFICATION OF WITNESS—EARNING CAPACITY OF DECEASED.

In an action for wrongful death of plaintiff's husband, manager of a small country newspaper, a witness who was engaged in the newspaper business in the same county, who had been familiar with deceased's newspaper for 15 years, and the character of deceased's management since he had been in charge, was qualified as an expert to testify to the reasonable value to the paper of deceased's managerial services.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2356½–2358; Dec. Dig. ☞543.]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by Lenice Curry Hulbert and others against the Southern Traction Company.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

Judgment for the named plaintiff, and defendant appeals. Affirmed.

Templeton, Beall & Williams, of Dallas, for appellant. Carden, Starling, Carden, Hemphill & Wallace, of Dallas, for appellees.

TALBOT, J. This suit was brought by Mrs. Lenice Curry Hulbert, as the surviving widow, and E. M. Hulbert and Mrs. May Hulbert, as the surviving parents, of Walter Hulbert, against the appellant, to recover damages on account of the death of the said Walter Hulbert, which occurred October 14, 1913, as the result of a collision between an interurban car of appellant, upon which the said Walter Hulbert was a passenger, and another car, which was negligently permitted to be on appellant's main line of road. The deceased and his wife were married in 1904. They had no children. The defendant admitted liability; and a trial of the case May 22, 1914, resulted in a verdict in favor of Mrs. Lenice Curry Hulbert for the sum of $12,000 and nothing for the parents. Appellant's motion for a new trial having been overruled, it perfected an appeal to this court, and presents two assignments of error for a reversal.

[1-3] The first assignment, which is submitted as a proposition, is, in substance, that the verdict of the jury is excessive because the evidence shows that the fair compensation to which Mrs. Lenice Curry Hulbert is entitled is much less than that awarded. We think the assignment of error must be overruled. The deceased, Walter Hulbert, was 30 years of age at the time of his death. He was the business manager of the Lancaster Herald, a newspaper owned by his father, E. M. Hulbert, and had been for about ten years. He was not paid a regular salary for his services, but drew from the revenues arising from the publication of the Lancaster Herald, with exception of some small amount received from a real estate business he was interested in, the amount necessary to support himself and wife, which the latter says was about $125 to $150 per month, and that for her personal use her husband contributed between $60 and $75 a month. Mrs. Hulbert further testified:

"My husband suffered on occasions from asthma. He would have three or four spells of asthma during a year. He may have been subject to them slightly at the time we were married, but I was not with him all the time to see. I heard that he had them. The spells seemed to be about the same with reference to being frequent, or closer together or less frequent, from the time we were married on down to his death. Of course, some attacks were more severe than others. With reference to the last five or six years of his life, there was not a bit of difference that I could see. Those attacks would last maybe from four to ten days, or three to ten days. We had a doctor to treat him, usually—Dr. Lyon, the doctor in Lancaster—just relieve him at the time he had a spell. Dr. Milliken treated him occasionally. Say, my husband might be sick to-night, and well in the morning, and he would get up and go to work, and whenever he was so that he could work, or, if there was any duty at the office, it wouldn't make any difference how sick he was, he went. My husband was a very active man. Anything he went into he went into it with his whole soul. He liked athletics very much. There wasn't anything he didn't like in the way of athletics. He played tennis last summer just as hard as anybody could play. In football games he went into them with all the force he had, and baseball the same way. He was very enthusiastic. He belonged to the volunteer fire company, and, if Walter didn't feel like it when the bell rang, it didn't make any difference how he felt, when it rang he went. Nothing would stop him from going. He was right there at his post. I, having been his wife, had an opportunity to observe his apparent condition of health. I believe that any one having seen him on the streets they could never have known that he had been sick one day. He was as young as a boy. He seemed to be about 21 or 22 years old. You would never have thought him to be 30 years old. If engaging in these sports and pastimes had any effect on him, it helped him. My husband had no bad habits. He was a sober man, very industrious. He was economical. We were furnishing our home and trying to get a start."

On cross-examination she said:

"Of course, in running the household, my husband and I lived there, and each one served the other. If he wanted anything done in the way of patching clothes or sewing on buttons, I would do it for him, and our services rendered one to the other were a mutual thing. I have answered that my husband contributed to me from $60 to $75 a month. I do not mean that he would just hand that much money over to me. I mean that it would take $125 or $150 a month for both of us, and of course my part of it would be half. I am sure that I am correct in stating that his only source of income was from the paper, plus whatever came from the real estate business."

Mrs. May Hulbert, mother of the deceased, testified, among other things:

That the deceased lacked a little of being 21 years old when he took over the business management of the Lancaster Herald; that the occasion of his "taking charge of the business was that his father lost his health; that his father had a nervous stomach trouble and a sunstroke and was not able to do any business after that."

She further testified:

That the deceased was the "mainstay" of herself and husband; that the sources of their revenue during his management of the newspaper came from him, "from the office, and he made it. It came from the office and Walter. He made it from the printing plant. All the revenue we had was from the Lancaster Herald. Our living expenses, including dry goods and groceries and incidental expenses of the household, amounted to between $175 and $200 a month. I believe the figures were $177 and something, as near as I can recollect."

She further testified that her husband had been a sufferer from asthma for about 30 years, and the deceased, Walter Hulbert, about 10 years; that the deceased had about four spells of asthma a year, each of which lasted from three to ten days; that, aside from his spell of asthma, the deceased appeared healthy; that he played tennis, baseball, football, and was a member of the fire department; that the fire department would have to pull the hose cart to fires when they occurred; and that the deceased did his share of that.

E. M. Hulbert testified:

"I have had asthma about 30 years, as near as I can remember, but I don't think it is as bad as it used to be. * * * I don't know exactly what the circulation of the paper was, 1,-400 or 1,500, somewhere around there. * * * It was a weekly paper, a dollar a year."

John E. Davis, engaged in the newspaper business at Mesquite, in Dallas county, testified that the Lancaster Herald had been on his exchange list for 15 years; that he considered it one of the best country papers in Texas; that he knew the deceased, Walter Hulbert, well; that he had had occasion and opportunity to observe frequently the advertising matter of the Lancaster Herald and the character of the management and supervision that Walter Hulbert exercised over it during his lifetime; that, from his knowledge of Walter Hulbert and the character of the Herald, he regarded him as a very capable newspaper man. He further testified, in answer to a hypothetical question, that taking for example the Lancaster Herald, with 1,250 subscribers, under the management of such a manager as Walter Hulbert, producing an income of from $175 to $200 a month net to the owner besides paying whatever compensation he took out of it and paying the expenses of the paper, etc., there was a market value in Dallas county and the surrounding country for managers of that kind; that the market for the services of such a manager is in the printing establishments over the country, and that, in his opinion, the services, such as were rendered to the Lancaster Herald by Walter Hulbert, were worth from $150 to $200 a month.

In relation to the nature of asthma and the question of whether its tendency was to shorten life expectancy, several expert physicians testified.

Dr. B. F. Lyon, of Lancaster, said, in substance, that he became acquainted with the deceased, Walter Hulbert, in 1899 or 1900; that he had known him intimately since that time; that he was not positive when he was first called to prescribe for him, but thinks it was in 1906; that he treated him for asthma from that time on until he died. He further says:

That in the beginning the attacks would last from four to ten days, and later would get longer and probably occur once or twice in a couple of weeks. "During the severe paroxysms or severe attacks he was confined to his room most of the time. Sometimes he would be able to get up during the day and go to his place of business and work a while, and the paroxysms would return, and he would go back home. His breathing was laborious and difficult." That he examined him 10 or 11 years ago for life insurance. That he had asthma at the time and was rejected. That he examined his heart and lungs several times, and that probably two years ago thought he found the heart a little enlarged. That he waited on him for asthma in September last fall, and he had what was called chronic bronchial asthma. That he had examined him several times in the last six or eight years, and he had asthma bad. The paroxysms were very bad. That they varied to some extent, but he would say they averaged about four times a year. That the last attack was in September, about a month before he died, and lasted 10 or 12 days. That he did not believe a man in that condition would live three score and ten years, but that he would not undertake to say how long he would live.

Dr. G. M. Hackler testified that asthma is a disease of the nerves, and affects the bronchial and smaller tubes of the lungs, and usually there is an encroachment on the mucous membrane of the bronchi, and has a tendency to lower the vitality and render persons more susceptible to other diseases. He further testified:

"My understanding is I think the heart is affected some after some of the other complications have arisen, emphycemia possibly, which is one of the complications of asthma after the patient has been suffering with it for some time. I feel like asthma does shorten the life of the person afflicted with it. I would not want to approximate the length of life, because some people would live longer than others. Some people would have more resistance than others, and we have no way of telling how much that resistance is."

Dr. C. M. Rosser testified that where asthma has existed for seven or eight years, with about four attacks a year of from three to ten days' duration, it is looked upon, he thought, "scientifically," as tending to shorten life expectancy. He said:

"I think that in a great number of cases the statistics would show a shorter life expectancy than it would in the same individual who did not have it. It would be so problematical, however, that practically I would not think so. I think the statistics would show some slight decrease. I think it is highly speculative. My observation of asthmatics has been that they live as constantly and as safely as other people. I have never known a patient to die of asthma."

Dr. S. E. Milliken testified:

"I have been living in Dallas and practicing medicine here for 26 years. I knew Walter Hulbert in his lifetime. I am a graduate of the University of Louisville, Ky., and have had hospital work in Louisville and New York. I treated Walter Hulbert a number of times during the past three or four years, and had occasion to see him in the year 1913. I examined him about two weeks before he died in October, 1913. Previous to that time I had made a number of examinations of him. He had bronchial asthma, but nothing else that I ever found. I searched for other things. I examined his heart some months before he died. I prescribed for him constitutional treatment a number of times. I did not find any complication to his heart at the time I examined it. There was no enlargement of his heart that was perceptible. I mean by that, if there was any, I couldn't detect it. I think I am qualified to detect when a man's heart is too big. A man's heart gets too large sometimes from asthma. That is one of the complications which we doctors always look for. Mr. Hulbert's asthma was strictly a typical case of bronchial asthma. With reference to his appearance, he looked about the same as when I first saw him. Hypertrophy, when applied to the heart, means an enlargement of the heart. Hypertrophy with dilation is a condition that comes on subsequent to hypertrophy. The process of hypertrophy is the result of intense effort of the heart muscles to pump the blood through the veins, and the dilation is the result of the heart after hypertrophy and its failure to do its work. It pulls or spreads out, as it were, and becomes weaker. That is one of the great dangers to which an

asthmatic is subject. I found no such condition in Walter Hulbert at the time I examined him. I never was able to detect that Walter Hulbert had any emphycemia, which is dilation of the little air chambers—the smallest air cells in the lungs—and the emphycemiaus condition is when they become dilated and the lung is unable to expel the air, or, in other words, to get the fresh air in and the old air out. In other words, a man drowns on his own oxygen—on his own air—because he cannot get the oxygen in his lungs and get a change in his blood, which is what oxygen does. That is what emphycemia is, and I don't find any of that. Walter Hulbert had a normal chest, and not a barrel chest. I should think that outdoor sports would be beneficial to an asthmatic. I would not require him to cease from them. In the advanced states of asthma, the difficulty is that they cannot lie down when their spell is on. The fact that they are able to lie down would be a good sign, I should say."

L. M. Cathles testified that the American Experience Table of Mortality shows the life expectancy of a man 30 years of age to be $35^{33}/_{100}$ years; that, on an average, a man who lives to be 30 years of age will live 35 years or more.

There was also testimony adduced tending to show that the earnings of the deceased during the last 10 years of his life did not exceed $70 per month, and, basing an estimate of the pecuniary value of his life to his wife on such earnings alone, it would fall short of the amount awarded by the jury. Such especially was the tendency of the testimony of the witness C. A. Buford, an expert accountant, employed to audit the books of the Lancaster Herald. But this testimony was not conclusive of the amount of the deceased's monthly earnings. On the contrary, the testimony of Mrs. Lenice Hulbert, quoted above, is to the effect that her husband received, from the business in which he was engaged at the time of his death, from $125 to $150 per month, and that she received one-half of said amount, and in addition to this is the testimony of the witness Davis to the effect that the value of deceased's services was from $150 to $200 per month. Besides, in Railway Co. v. Lehmberg, 75 Tex. 61, 12 S. W. 838, which was a suit by the surviving wife to recover for herself and two minor children damages suffered on account of the death of the husband and father, it is said by the Supreme Court of this state that:

"While the law does not, in this character of action, intend to give compensation for anything but pecuniary loss by estimating the money value of the life of the relative, and while it necessarily results that regard must in each instance be paid to such facts and conditions as cast light upon the subject, it yet must be admitted that the inquiry is not intended to be narrowed down by the law to a result that can be exactly accounted for by the facts in evidence. Every parent and husband has, for his wife and children, a pecuniary value beyond the amount of his earnings by his labor or vocation."

These remarks, contrary to the views expressed by counsel for the appellant in argument, are as applicable where the surviving widow sues for the damages sustained by her and the interest and rights of minor children are not involved, as in cases where the suit is to recover damages for herself and minor children. This is made perfectly clear by the language of the court, which, omitting that applicable to children, is that every husband has for his wife a pecuniary value beyond the amount of his earnings or vocation. It is further remarked in this case that the difficulties of proof in such actions are known to the lawmaker, and that:

"When no amount is fixed by law [as is the case with us], and no rule is prescribed for making the calculation upon facts capable of exact ascertainment, it necessarily follows * * * that the lawmaker intended that, having reference, as far as practicable, to conditions existing at the time of the death, juries from their own knowledge, experience, and sense of justice should fix and assess the proper sum."

That the rate of wages paid at the time of the death of the deceased in suits of this character is not exclusively the standard of the damages sustained is affirmed in Baltimore & Ohio Railway Co. v. State, 24 Md. 271, and this case is cited with approval in Railway Co. v. Lehmberg, supra. But, if it was the duty of the jury to calculate the pecuniary value of Walter Hulbert's life to his wife from the facts disclosed by the evidence specifically showing such value, still we are not prepared to say the verdict should be set aside on the ground that it is excessive. We think the evidence, as a whole, sufficient, even though it be admitted that the life expectancy of Walter Hulbert, on account of the asthma with which he was suffering, was only about one-half of what it otherwise would have been, to authorize the jury's finding that Mrs. Lenice Hulbert had sustained damages on account of the death of her husband in the amount awarded her, and, if it does, then, under the thoroughly established rule of practice in this state, we would not be warranted in disturbing their verdict. This is true, notwithstanding this court, sitting as a jury, might, upon the same evidence, have awarded a smaller amount. It is only when the evidence so preponderates against the verdict that it may be said to be clearly wrong that the appellate court should interpose and set it aside. No such preponderance, in our opinion, is found in this case. Of course, juries are expected to act and should act uninfluenced by partiality, passion, or prejudice, "and to pay due regard to the ascertained facts," and, when it appears that they have failed so to act, their verdict should not be allowed to stand. If, however, as said in the case of Railway Co. v. Lehmberg, already referred to—

"the court is unable to determine that these things have not been observed by the jury, and when it does not appear that the verdict is not the result of the honest endeavor of the jury to follow their own convictions in the exercise of a power not precisely defined, we think the law intends that the jury's estimate, rather than the equally undefined one of the judges, shall prevail."

There is nothing in the record sent to this court, unless it be the amount of the ver-

dict, which in the slightest indicates that the jury was influenced, in estimating the pecuniary loss of Mrs. Hulbert on account of the death of her husband, by any improper motive, and, as there is substantial testimony in support thereof, their verdict will not be set aside.

[4] The second assignment of error complains of the admission, over objections of the appellant, of the testimony of the witness John Davis to the effect that there was a market value in Dallas county and the surrounding country for a manager of a newspaper such as Walter Hulbert was in his lifetime, and that the reasonable market value of the services of such a manager as Walter Hulbert was for the running of the Lancaster Herald was from $150 to $200 per month. There are four propositions propounded under this assignment, which are as follows:

First: "In a suit of this character (for the recovery of compensation for the loss of a husband), it is improper and prejudicial to admit proof, even by an expert witness, of the market value of the services of such a manager of a newspaper as the deceased, Walter Hulbert, was. There is no market value of men or any man. There may be a reasonable, customary, ordinary price or compensation paid to employés, agents, or managers, whether same be railroad, store, or newspaper, but we submit that there is no market value for such a purpose, in connection with the personal traits and habits of any individual."

Second: "The witness John Davis failed to qualify as a witness as to the market value of such a person as Walter Hulbert, or that there was a market for such a person, and hence should not have been permitted to testify upon the question."

Third: "The question propounded to the witness is argumentative and suggestive, and calls for the opinion and conclusion of the witness."

Fourth: "The market value of services, such as were rendered by Walter Hulbert, was not the standard of damages presented in the petition of plaintiff, and hence the same should not have been permitted."

No case is cited in which the first question presented has been passed upon by any appellate court in this state, and it seems to be one of first impression here. Decisions in other jurisdictions directly in point, however, have been furnished us by counsel for appellees. Railway Co. v. Teeter, 166 Ind. 335, 77 N. E. 599, 5 L. R. A. (N. S.) 425; Harmon v. Old Colony R. Co., 168 Mass. 377, 47 N. E. 100. In the first case cited, one of the questions asked the witness, and which was objected to, is as follows:

"In the profession of life for which you have fitted yourself, and which was your calling and life work, you may state to the jury what, at the time of the accident, your services in said profession were fairly and reasonably worth in the market."

Upon appeal, appellant's counsel urged that while it was competent for the appellee to state what his employment was, and all the facts and circumstances which would tend to show his ability to earn money, it was not competent for him to give in evidence his opinion as to the market value of his services.

The Supreme Court of Indiana held the question proper and the testimony competent. In so doing the court said.

"Dealing * * * with the question as to the testimony as to the fair and reasonable worth of appellee's services in the market, we have to say that there can be absolutely no question as to the right to prove such a fact as applied to some distinct vocation in life, in which the person in question is specially skilled, and concerning which it may be presumed that there exists a demand at a salary or wage compensation."

In support of this ruling the court cited a number of cases, among which is the case of Harmon v. Old Colony R. Co., 168 Mass. 377, 47 N. E. 100, supra, and from which the following quotation is made:

"If the plaintiff's services had a market value, in the kind of business in which she was engaged, such market value might be proved to the jury as a fact which they might take into consideration in determining the amount of damages."

Again, in Matteson v. New York Central Railroad Co., 35 N. Y. 487, 91 Am. Dec. 67, we find the following statement and holding of the court, namely:

"With a view to establishing the amount of damages, the question, 'What could such services as Mrs. Matteson's be procured for?' was competent; the witness having stated, * * * also, his means of knowledge. The value of the services of different individuals varies, and the plaintiff was not confined to the average value, if the services of his wife were worth more than that."

John Davis very clearly qualified as a witness competent to speak as to whether or not the services of such a man as Walter Hulbert had a market value, and as to what was such market value, and, upon the authority of the cases above cited, we hold the court did not err in admitting his testimony in respect thereto. The text-writers use the terms "value" and "market value" as interchangeable and both as being equivalents of actual value, and so, after all, the appellee, in proving the market value of the deceased's services, as was done by the testimony here under consideration, only proved their actual value. The witness Davis, speaking of the character of services of Walter Hulbert, said:

"I will say that a man desiring to sell that character of services would have no difficulty in doing so. * * * The market is in the printing establishments over the country."

The objections to the testimony should not have been sustained on the ground that the question eliciting it was argumentative, suggestive, and called for the opinion of the witness, nor on the ground that the market value of services, such as were rendered by Walter Hulbert, was not the standard of damages presented in the petition. The question was a hypothetical one, enumerating the facts in evidence upon which the opinion of an expert witness was sought in relation to matters which were the subject of expert testimony, and the allegations of the petition were broad enough and amply sufficient to authorize the admission of such testimony.

Appellees have filed and presented in this court a motion to affirm the judgment, with damages. This motion will be denied. In view of the size of the verdict and the conflicting testimony in regard to the amount of the damages sustained by Mrs. Hulbert, we do not think it can be fairly said that appellant's assignments of error are so clearly without merit as to justify the conclusion that the appeal was not taken in good faith and without reasonable grounds to believe the judgment should be reversed.

The judgment is affirmed, without damages.

Affirmed.